[No. C024576. Third Dist. Sept. 15, 2000.]

PLANNING AND CONSERVATION LEAGUE et al., Plaintiffs and Appellants, v.
DEPARTMENT OF WATER RESOURCES, Defendant and Appellant;
CENTRAL COAST WATER AUTHORITY, Defendant and Respondent.

896

## COUNSEL

Antonio Rossmann and Roger B. Moore for Plaintiffs and Appellants.

Thomas J. Graff for Environmental Defense Fund as Amicus Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Roderick E. Walston, Chief Assistant Attorney General, Charles W. Getz IV and Richard M. Frank, Assistant Attorneys General, and Marian E. Moe, Deputy Attorney General, for Defendant and Appellant.

Hatch & Parent and Susan F. Petrovich for Defendant and Respondent.

## OPINION

**RAYE, J.**—In this case we consider the sufficiency of the environmental review of the Monterey Agreement, a statement of principles to be incorporated into an omnibus revision of the long-term contracts between the Department of Water Resources (DWR) and local water contractors governing the supply of water under the State Water Project (SWP). The Monterey Agreement was the culmination of negotiations among DWR and six local water contractors to settle disputes arising under article 18 of the long-term contracts. The agreement contemplated revisions in the methodology of allocating water among contractors and changes in the operation of certain SWP facilities, including the transfer of the Kern Fan Element, one of eight elements comprising a subsurface reservoir, the Kern Water Bank, from DWR to designated contractors. The contractors agreed to have one of their own, the Central Coast Water Authority (CCWA), serve as the lead agency under the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)

In the underlying mandamus and validation proceedings, two citizens groups and a public agency challenged the selection of CCWA as the lead

agency and the sufficiency of the EIR (environmental impact report) it prepared, and challenged the transfer of the Kern Fan Element.[1] Plaintiffs' amended complaint sought declaratory and injunctive relief against DWR and CCWA with regard to the Monterey Agreement, which, when implemented in December 1995, altered DWR's allocation of water from the SWP to various local water agencies.

We agree with the trial court that DWR, not CCWA, has the statutory duty to serve as lead agency in assessing the environmental consequences of projects involving the SWP. We conclude the trial court erred by finding CCWA's EIR sufficient despite its failure under CEQA to discuss implementation of article 18, subdivision (b), as a "no project" alternative. The error mandates preparation of a new EIR under the direction of DWR. Finally, we conclude the trial court erroneously dismissed the challenge to DWR's transfer of title to a storage facility (the validation cause of action) and execution of amended contracts for failure to name and serve indispensable parties.

FACTS

In 1951 the California Legislature authorized construction of a state water storage and delivery system. (Cal. Dept. Water Resources, Management of the Cal. State Water Project, Bull. No. 132-95 (Nov. 1996) p. xxiii.)[2] Eight years later, the Legislature authorized the submission for voter approval of a $1.75 billion general obligation bond issue to build the SWP. The voters subsequently approved the measure and construction thereafter commenced. (Wat. Code, § 12930 et seq.; DWR, Bull. No. 132-93 (Sept. 1994) p. 15.)

The SWP was designed to become a complex system of reservoirs, dams, power plants, pumping plants, canals, and aqueducts to deliver 4.23 million

---

[1]Plaintiffs and appellants include the Planning and Conservation League (PCL), the Citizens Planning Association of Santa Barbara County, Inc. (CPA), and Plumas County Flood Control and Water Conservation District (Plumas). DWR and CCWA are referred to collectively as defendants in this opinion, although we note CCWA did not perfect a timely cross-appeal. CCWA is a joint powers agency formed in 1991 among nine member water agencies within Santa Barbara County.

[2]We take judicial notice of the annual SWP management bulletins published by DWR. (*Baldwin v. County of Tehama* (1994) 31 Cal.App.4th 166, 178, fn. 8 [36 Cal.Rptr.2d 886]; *Johnson Rancho County Water Dist. v. State Water Rights Board* (1965) 235 Cal.App.2d 863, 873 [45 Cal.Rptr. 589].) These bulletins hereafter will be referred to as "DWR, Bulletin No." DWR's request to take judicial notice of environmental documents prepared after the EIR was certified in this case is denied. Such documentation is irrelevant to the issues before us.

acre-feet (maf) of water annually.[3] (DWR, Bull. No. 132-93, *supra*, p. 52.) The initial facilities, consisting of 22 dams and reservoirs, 14 pumping plants, four hydroelectric power plants, three pumping-generating plants, and 550 miles of aqueducts and pipelines, delivered about one-half of the forecast goal. (*Id.*, pp. 17, 18.)

DWR is a major developer of water resources in the state. (DWR, Bull. No. 132-93, *supra*, p. 15.) DWR builds and operates the facilities and manages the SWP. (*Ibid.*) At the inception of the project, DWR entered into individual contracts with 29 agricultural and urban water suppliers throughout the state. These contractors received entitlements to an annual amount of water in return for which they repay a proportionate share of the financing and maintenance of the SWP facilities. Under the SWP, water contractors "are obligated to pay for their contractual entitlements of water" from the project, "whether the water is delivered or not." (*Pending Federal Actions* (Apr. 1998) 8 Cal. Wat. L. & Policy Rptr. 144.)

Key provisions in the initial long-term contracts are substantially the same. DWR committed to build those facilities that, when completed, would enable it to deliver to all contractors the total entitlements of over four maf of water. Nevertheless, the parties anticipated a possible shortage in the water supply. Article 18 of the contracts outlines the reallocation of water among contractors in years of temporary shortage and also addresses the prospect of long-term shortfalls. Because these provisions play a central role in this case, we quote the relevant portions of subdivisions (a) and (b) at length.

"(a) In any year in which there may occur a shortage due to drought or other temporary cause in the supply of project water available for delivery to the contractors, with the result that such supply is less than the total of the annual entitlements of all contractors for that year, the State shall, before reducing deliveries of project water to all contractors, reduce the delivery of project water to each contractor using such water for agricultural purposes by a percentage, not to exceed fifty percent (50%) in any one year or a total of one hundred percent (100%) in any series of seven consecutive years, of that portion of the contractor's annual entitlement for the respective year which is to be put to agricultural use as determined by the State . . . ."

---

[3] "An acre-foot is 43,560 cubic feet. Colloquially, it is an irrigation-based measurement equalling the quantity of water required to cover an acre of land to a depth of one foot." (*Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 182, fn. 1 [29 Cal.Rptr.2d 128].)

Subdivision (a) is referred to as "the agriculture first deficiency." Although agricultural contractors suffer first during a temporary shortage under subdivision (a), they are entitled to makeup water first in times of surplus.

Subdivision (b) contemplates a more serious threat to the long-term water supply. It states in relevant part: "In the event that the State is unable to construct sufficient additional conservation facilities *to prevent a reduction in the minimum project yield,* or if for any other reason there is a reduction in the minimum project yield, which, notwithstanding preventive or remedial measures taken or to be taken by the State, threatens a permanent shortage in the supply of project water to be made available to the contractors: [¶] (1) The annual entitlements and the maximum annual entitlements of all contractors, except to the extent such entitlements may reflect established rights under the area of origin statutes,[4] shall, by amendment of Table A included in Article 6(b), and of Article 7(b), respectively, be reduced proportionately by the State to the extent necessary so that the sum of the revised maximum annual entitlements of all contractors will then equal such reduced minimum project yield . . . ."

By the late 1980's and early 1990's, the pressures on the SWP grew acute. Supplies were severely diminished as a result of a seven-year drought. Laws and regulations designed to protect the environment also limited the supply of water. Disputes arose among agricultural and urban contractors and DWR about how the limited amount of water should be distributed.

In its search for additional water supplies, DWR investigated the plausibility of establishing a water bank in Kern County. The Kern Water Bank is a subsurface reservoir designed to store surplus water from the Sacramento-San Joaquin Delta (the Delta) in the groundwater basin during wet years for extraction during dry years. (DWR, Bull. No. 132-93, *supra,* p. 11.) One of eight elements comprising the Kern Water Bank is the Kern Fan Element. (*Id.,* p. 170.) In 1986 DWR purchased the Kern Fan Element, planning to construct recharge basins, extraction wells, and conveyance facilities. The improvements were expected to increase storage capacity to about one maf. (*Id.,* p. 11.) After completion of a supplemental environmental impact report, however, DWR halted all design work, preparation of contracts, and feasibility work because of problems in the Delta and the adverse environmental impacts of the Kern projects. (*Id.,* pp. 11-12.)

In 1991, as California entered a fifth year of drought, DWR organized a drought water bank allowing for large scale water transfers to ameliorate the

4Area of origin statutes at Water Code sections 10505.5 and 11460 reserve water in the counties where watershed originates as needed for local growth.

overall water shortage. DWR prepared an extensive EIR to meet its CEQA charge. In spite of the lengthy drought, DWR was able to meet contractors' requests for delivery in each year except 1994.

Nevertheless, urban and agricultural contractors disputed DWR's implementation of article 18 of their long-term contracts. The agricultural contractors contended the shortages were not due to the drought, but rather to DWR's failure to complete the facilities originally envisioned as the SWP. The urban contractors held secret negotiations concerning article 18. Each urban contractor was obligated to execute a confidentiality agreement before participating in the meetings held to discuss revision of article 18. The threat of litigation loomed.

The warring factions agreed to negotiate a settlement of the article 18 controversy. The primary objective was to avoid litigation. Agricultural and urban contractors met with DWR in Monterey in the fall of 1994 to "search for an answer to a single—but critical—problem in managing the SWP: How to allocate the water supply equitably during times of shortage." (DWR, Bull. No. 132-95, *supra*, p. 5.) "Soon after discussions began, the parties determined that the water allocation problem was far too complex to be effectively approached as a single-issue problem. Article 18 negotiations grew into an omnibus revision of the SWP long-term contracts and their administration—an endeavor to update management of the SWP." (*Id.*, p. 7.)

After two months of negotiations, DWR and agricultural and urban contractors agreed to a statement of 14 principles, which came to be known as the Monterey Agreement. One of the major goals of the Monterey Agreement was to "[i]ncrease water management flexibility, providing more tools to local water agencies to maximize existing facilities." (DWR, Bull. No. 132-95, *supra*, p. 7.) To accomplish this goal, DWR would:

"transfer control of the Kern Water Bank property to the agricultural contractors,

"provide for permanent sales of water among contractors,

"provide more flexibility in using certain reservoirs for local use,

"implement a simpler program for interruptible water supplies,

"provide new rules for transportation of non-SWP water to contractors, and provide new rules for storing water outside a contractor's service area.

"As part of this agreement, 45,000 acre feet of annual entitlement belonging to two agricultural contractors will be retired. In addition, voluntary entitlement transfers of about 130,000 acre-feet from agricultural to urban users will likely proceed." (DWR, Bull. No. 132-95, *supra*, p. 8.)

The Monterey Agreement afforded many benefits to individual contractors by increasing their own water supply reliability through:

"water transfers,

"water banking,

"storage outside service areas,

"transport of nonproject water, permanent sales of water among contractors,

"annual turn-back programs,

"use of Kern Water Bank property by agricultural contractors for water banking, and

"access by urban water contractors to Kern Water Bank use." (DWR, Bull. No. 132-95, *supra*, pp. 8-9.)

DWR showcases the Monterey Agreement as "evidence of a partnership spirit among the agricultural and urban contractors and the Department." (DWR, Bull. No. 132-95, *supra*, p. 9.) For the settlement to become effective, the 14 principles of the Monterey Agreement had to be translated into legally binding contract amendments, and the two largest water contractors, Kern County Water Agency (KCWA) and Metropolitan Water District of Southern California, had to execute the amended contracts. They have done so.

Those contractors who participated in the Monterey negotiations, together with DWR, determined that implementation would have potential adverse environmental impacts necessitating the preparation of an EIR and the inclusion of the public in the environmental review process. They agreed to appoint the CCWA to serve as lead agency under CEQA.

A programmatic EIR was completed and certified by CCWA in October of 1995. DWR, as a responsible agency, issued findings and adopted the EIR two months later. On December 13, 1995, DWR executed the Agreement for the Exchange of the Kern Fan Element of the Kern Water Bank, by which

DWR agreed to divest and convey the 20,463 acres of state property known as the Kern Fan Element.

The sufficiency of the EIR was challenged by a water agency as well as citizens groups. PCL petitioned the superior court for a writ of mandamus compelling DWR to serve as lead agency and to properly prepare and certify a legally adequate EIR. A later amendment, to which CPA and Plumas were added as plaintiffs, challenged DWR's transfer of title to the Kern Fan Element and the execution of amended contracts in a reverse validation cause of action.

DWR and CCWA brought a summary adjudication motion on the validation cause of action, contending the action must be dismissed because petitioners failed to name and serve indispensable parties, the individual contractors. Several of those contractors also brought motions to quash service. The trial court granted all motions and entered judgment against plaintiffs on the CEQA claims. The court ruled that although CCWA improperly served as the lead agency, the EIR was adequate and, therefore, the CEQA violation was not prejudicial.

Plaintiffs appealed. We dismissed the appeal of the order quashing service as untimely. The Supreme Court affirmed our dismissal. (*Planning & Conservation League v. Department of Water Resources* (1998) 17 Cal.4th 264 [70 Cal.Rptr.2d 635, 949 P.2d 488] (*Planning & Conservation League I*).) We now have before us the appeal of the judgment, including the dismissal of the validation claim, and a cross-appeal challenging the trial court's ruling that the lead agency designation was improper.

DISCUSSION

I

*Lead Agency*

Under CEQA, a "lead agency" is responsible for determining whether an EIR is required for a project and, if so, for preparing the EIR and including it in any report on the project. (*Friends of Cuyamaca Valley v. Lake Cuyamaca Recreation & Park Dist.* (1994) 28 Cal.App.4th 419, 426 [33 Cal.Rptr.2d 635].) The lead agency, with responsibility for the process by which the EIR is written, approved and certified, plays a crucial role.

The importance of the lead agency throughout the fluid environmental review process was highlighted in *Kings County Farm Bureau v. City of*

*Hanford* (1990) 221 Cal.App.3d 692 [270 Cal.Rptr. 650]. "The lead agency must *independently* participate, review, analyze and discuss the alternatives in good faith." (*Id.* at p. 736.) Moreover, the agency's opinion on matters within its expertise is of particular value. (*Ibid.*) As the process continues, "the lead agency may determine an environmentally superior alternative is more desirable or mitigation measures must be adopted." (*Id.* at p. 737.) In sum, the lead agency plays a pivotal role in defining the scope of environmental review, lending its expertise in areas within its particular domain, and in ultimately recommending the most environmentally sound alternative.

The trial court found that CCWA should not have been designated as the lead agency for the purpose of preparing the EIR for the implementation of the Monterey Agreement. The court explained: "Public Resources Code Section 21067 provides the statutory definition of the term 'lead agency' under CEQA: 'the public agency *which has the principal responsibility for carrying out or approving* a project which may have a significant effect upon the environment.' (Emphasis added.) In this case, the record clearly shows that CCWA does not have the principal responsibility for carrying out or approving the implementation of the Monterey Agreement. The text of the Agreement itself shows that the principal part of the implementation process will consist of negotiating and executing a series of amendments to the existing State Water Project contracts between DWR and the 29 contracting agencies. [Fn. omitted.] CCWA is, at most, a party to one of those contracts, [fn. omitted] and thus cannot actually execute the amendments. Also, there is no evidence in the record which would show that CCWA will be responsible for negotiating the amendments with the contracting agencies. The text of the Agreement and the evidence in the record suggest that it will be primarily the task of DWR to carry on the negotiations and execute the amended agreements. [¶] Similarly, many of the remaining provisions of the Monterey Agreement reveal on their face that they must be implemented primarily, if not solely, by DWR and/or other contractors. In fact, the record shows that the only asserted justification for naming CCWA as the lead agency was that it recently had gone through the environmental review process on another project and had expertise in that process. [Fn. omitted.] Thus, the record does not support the designation of CCWA as lead agency."

Defendants insist that all parties present for the negotiation of the Monterey Agreement have an ongoing responsibility to encourage the remaining contractors to sign amended contracts and to participate in various aspects of the implementation of the agreement. They emphasize that no one party has the unilateral right to control the implementation. According to defendants, therefore, DWR does not have principal responsibility for approving and carrying out the project, and the various public agencies involved were free to elect any one of their number to act as lead agency. We disagree.

CEQA defines a lead agency as "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (Pub. Resources Code, § 21067.) By contrast, a "responsible agency" means " 'a public agency, other than the lead agency, which has responsibility for carrying out or approving a project.' " (*City of Redding v. Shasta County Local Agency Formation Com.* (1989) 209 Cal.App.3d 1169, 1174 [257 Cal.Rptr. 793], quoting Pub. Resources Code, § 21069.) " 'Where a project is to be carried out or approved by more than one public agency, one public agency shall be responsible for preparing an EIR or negative declaration for the project. This agency shall be called the lead agency.' " (209 Cal.App.3d. at p. 1174, quoting Cal. Code Regs., tit. 14, § 15050, subd. (a).)

The CEQA guidelines (Guidelines; found at Cal. Code Regs., tit. 14, § 15000 et seq. (all references to Guidelines shall be to title 14 of the California Code of Regulations)) set forth the criteria for identifying which agency shall act as the lead agency where two or more public agencies are involved in the process. Guidelines, section 15051, subdivision (d), provides: "Where the provisions of subsections (a), (b), and (c) leave two or more public agencies with a substantial claim to be the lead agency, the public agencies may by agreement designate an agency as the lead agency. An agreement may also provide for cooperative efforts by two or more agencies by contract, joint exercise of powers, or similar devices."

Defendants rely on the Guidelines as authority for the execution of their agreement to allow CCWA to act as lead agency. Their argument depends on the validity of their thesis: "Because this 'project' could not be carried out without the joint action of DWR and the contractors, both DWR and the contractors, as a group, (particularly those whose execution was a prerequisite to the effectiveness of the Monterey Amendment) constituted 'public agencies' with shared principal responsibility for carrying out or approving the project."

Defendants urge us to apply a deferential standard of review to the public agencies' joint decision to allow CCWA to act as lead agency. Defendants praise the agencies for avoiding litigation of the lead agency question but ignore the more salient facts and the fundamental principles of appellate review.

While applauding the settlement success of the seven parties that negotiated the Monterey Agreement, defendants forget the 23 water contractors and the members of the public who were not invited to the table. In comments to the draft EIR, various parties objected to DWR's delegation of

its responsibilities to CCWA and their exclusion from the process whereby DWR and all but six contractors agreed to CCWA's appointment as lead agency. On appeal, defendants ask us to apply the same deferential standard of review as decisions reached after *public* review of an EIR.

■ The "interpretation and applicability of a statute is a question of law requiring an independent determination by the reviewing court." (*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155, 165 [258 Cal.Rptr. 147].) ■ Here, the facts are undisputed. Plaintiffs do not contest defendants' assertion that it takes two parties to enter a contract. DWR must negotiate amended contracts with each of the water contractors, and the greater the extent to which CCWA and the other five contractors that negotiated the Monterey Agreement help facilitate the negotiations, the more likely all the principles of the agreement will be implemented. But this reality does not alter the rules of appellate review. We are presented with a question of law requiring de novo review.

Neither the language of the statute nor the facts of this case support a so-called shared principal responsibility. Public Resources Code section 21067 plainly requires the public agency with principal responsibility to assume the role as lead agency. CCWA, a regional water contractor, does not have principal responsibility for implementing the Monterey Agreement, although it may have a substantial stake in seeing it implemented. By contrast, DWR, the state agency charged with the statutory responsibility to build, manage, and operate the SWP, clearly retains the principal responsibility to execute amended long-term contracts, to convey the Kern Fan Element, and to facilitate the water transfers allowed under the Monterey Agreement.

It is DWR that "manage[s]" the SWP, "the largest state-built, multipurpose water project in the country. Approximately 20 million of California's 32 million residents receive at least part of their water from SWP, and SWP water is used to irrigate approximately 600,000 acres of farmland." (DWR, Bull. No. 132-93, *supra*, p. 15.) It is incongruous to assert that any of the regional contractors simply by virtue of a private settlement agreement can assume DWR's principal responsibility for managing the SWP. Under these circumstances, those at the negotiating table were not at liberty to anoint a local agency to act in place of DWR.

In *City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960 [3 Cal.Rptr.2d 643] (*City of Sacramento*), the appointment of the wrong lead agency required our reversal. We wrote: "Despite plaintiffs' contention that DFA's responsibility over pesticide regulation does not

extend to regulating discharges into state waters, the statutory scheme described above establishes concomitant responsibility in DFA and the Regional Board for protecting state waters from pesticide pollution. The Regional Board's responsibility is to protect state waters from *all* forms of pollution, while DFA's responsibility is limited to pesticide pollution. However, DFA's responsibility extends beyond water pollution to include the *total* environment. Thus, because the underlying purpose of an EIR is to analyze and inform regarding adverse effects to the environment as a whole (Pub. Resources Code, § 21061), DFA is in the best position to make such an assessment." (*Id.* at p. 973.)

Similarly, DWR has a statewide perspective and expertise. The allocation of water to one part of the state has potential implications for distribution throughout the system. DWR is painfully familiar with the problems plaguing the Delta and the possible impacts of the Delta Accord, an agreement between the federal and state governments, on the Kern Fan Element. As in *City of Sacramento*, it is the "logical choice for lead agency" because it has principal responsibility for implementation of an agreement that substantially restructures distribution of water throughout the state.

So significant is the role of the lead agency that CEQA proscribes delegation. This prohibition was articulated in *Kleist v. City of Glendale* (1976) 56 Cal.App.3d 770, 779 [128 Cal.Rptr. 781]: "Neither the CEQA nor the state guidelines authorize the city council to delegate its review and consideration function to another body. Delegation is inconsistent with the purpose of the review and consideration function since it insulates the members of the council from public awareness and possible reaction to the individual members' environmental and economic values. Delegation is inconsistent with the purposes of the EIR itself."

We thus agree with the trial court that CCWA should not have been designated as the lead agency. Plaintiffs argue on appeal as they did before the trial court that appointment of the wrong lead agency taints the entire EIR process, is inherently prejudicial, and compels a fresh start with an appropriate lead agency. The trial court disagreed, concluding that it would instead assess whether the improper designation caused the "omission of vital information from the environmental review process." It found the EIR adequate; the improper designation of CCWA as lead agency amounted to harmless error. We will conclude the EIR is defective in at least one critical respect and order the preparation of a new EIR under the direction of DWR.

## II

### *The EIR*

#### A. *Introduction*

Shortage precipitates conflict. In this state, when water is the commodity in short supply, the conflict threatens the most basic interests of competing stakeholders. Those who negotiated the existing long-term contracts anticipated water shortfalls and incorporated article 18 as a mechanism for resolving both temporary and permanent shortages. Under the Monterey Agreement, the temporary solution embodied in article 18, subdivision (a), was completely renegotiated and the permanent solution embodied in article 18, subdivision (b), simply was eliminated.[5] The issue posed by CEQA is whether the EIR adequately addressed the environmental impacts of eliminating article 18, subdivision (b)'s solution to a permanent water shortage.

Ironically, while the desire to settle article 18 disputes was the driving force behind the Monterey negotiations, the draft EIR failed to consider the impact of implementing article 18, subdivision (b). That failure generated the most comments to the draft EIR. The draft assumed that, under its limited description of the no project alternative, "[n]o changes in SWP water allocations occur." But many commenters disagreed and urged CCWA to broaden the discussion of the so-called no project alternative. One commenter wrote: "The DEIR must analyze this 'no project' alternative if we are to take any of it seriously. The analysis must include a parametric analysis of alternative levels of a lowered project yield tested by use of DWR's simulation model to establish which level of yield provides for the maximum reliability of deliveries given some tolerable threshold for failure to meet requests (i.e. with what frequency will Article 18(a) be allowed to be invoked and with what consequences.) [¶] All this can be accomplished without modification of the existing contracts."

Another commenter explained: "The No Project Alternative discussion must be expanded considerably to include measures that could be implemented under existing contracts that may address some or all of the project

---

[5]The original long-term contracts between DWR and the water contractors were predicated on the state's contractual obligation to build out the SWP so as to deliver 4.23 maf of water to the contractors annually. Each of the contractors is allocated a percentage of the 4.23 maf in table A of the long-term contracts. The allocation is referred to as an entitlement. Therefore, cumulatively, the contractors are "entitled" to 4.23 maf of water annually.

The SWP, however, has never been completed and the state cannot deliver 4.23 maf of water annually. The entitlements represent nothing more than hopes, expectations, water futures or, as the parties refer to them, "paper water." Actual, reliable water supply from the SWP is more in the vicinity of 2 to 2.5 maf of water annually. Consequently, there is a huge gap between what is promised and what can be delivered.

objectives. In particular, Article 18(b) of existing SWP contracts, which would be eliminated by implementation of the Monterey Agreement, provides a means of addressing the water allocation concerns that prompted the Monterey Agreement. [¶] . . . Under current economic, political, and environmental circumstances, there is no prospect or expectation that the SWP can deliver anywhere near the total project entitlement. Article 18(b) mandates that DWR reduce all entitlements proportionately. The EIR incorrectly states that under the No-Project Alternative no changes in SWP water allocation will occur. Since changes in SWP water allocation must occur if Article 18(b)'s alternative criteria are satisfied, the EIR must be revised to include the implementation of Article 18(b) as part of the analytical baseline for the Monterey Agreement."

Several commenters urged CCWA to analyze the article 18, subdivision (b), option. "Article 18(b) of the contracts is invoked and all entitlements are adjusted to reflect actual, reliable water supplies deliverable under the contracts. (The new entitlement figures must incorporate reduced extractions resulting from recent legislative, administrative, and legal decisions. In that they may be further reduced in the future by the same processes, the new entitlement figures should be determined with careful attention to environmental constraints.)" Nearly all the commenters registered the failure of the EIR to discuss the reaffirmation in principle 12 of the Monterey Agreement to build out the SWP facilities while deleting the article 18, subdivision (b), option to reduce entitlements and thereby eliminate the pressure on the system to build more facilities. In the final EIR, principle 12, like article 18, subdivision (b), was deleted.

Plaintiffs agree with the commenters, insisting the EIR's failure to explore article 18, subdivision (b), under the rubric of a no project alternative renders the EIR inadequate. According to plaintiffs, the absence of a thorough examination of the environmental impacts of article 18, subdivision (b)'s solution to permanent water shortages deprived both the public agencies charged with renegotiating their contracts and the public of information essential to understanding the environmental consequences of the provision's elimination.

Defendants, on the other hand, contend it was not reasonably likely the section would be invoked in the foreseeable future and thus there was no need to speculate about the environmental consequences of such an event. Defendants endorse the trial court's findings that the history of water deliveries in the state, even during drought years, and the likelihood of litigation rendered it unlikely entitlements would be reduced under article

18, subdivision (b).[6] Alternatively, defendants claim the discussion of article 18, subdivision (b), in the final EIR as an infeasible alternative satisfied plaintiffs' concerns and CEQA's mandate. We disagree with defendants on both counts.

### B. CEQA and the "No Project" Alternative

■ "CEQA is a comprehensive scheme designed to provide long-term protection to the environment. [Citation.] In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. [Citations.] CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 [65 Cal.Rptr.2d 580, 939 P.2d 1280].)

■ Both the mandate and the mechanism of CEQA are carefully crafted and well ingrained into the law of this state. (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 943 [91 Cal.Rptr.2d 66].) The EIR, with all its specificity and complexity, is the mechanism prescribed by CEQA to force informed decision making and to expose the decision making process to public scrutiny. (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 86 [118 Cal.Rptr. 34, 529 P.2d 66]; *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1123 [71 Cal.Rptr.2d 1].) The EIR is, as the courts have said repeatedly, the " 'heart of CEQA,' " "an 'environmental "alarm bell," ' " and a "document of accountability." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).)

"Whenever a project may have a significant and adverse physical effect on the environment, an EIR must be prepared and certified. (§ 21100, subd. (a); cf. *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 277-279

---

[6]As expressed by the trial court, "[Plaintiffs] have not shown that enforcement of Article 18(b) is foreseeable, or even likely, under any circumstances. To the contrary, the Court is persuaded by the arguments of the [defendants] that attempted enforcement of Article 18(b) would lead to disputes among the contractors, and probably to lengthy and difficult legal proceedings. The Court has reviewed provisions of Article 18(b) and agrees with [defendants] that invocation of its terms is far from automatic. Particularly in view of the history of deliveries of water in recent years, which is set forth in the record, the Court does not find that enforcement of Article 18(b) is reasonably foreseeable if the Monterey Agreement is not implemented. Accordingly, the EIR is not deficient for failing to include that assumption in its discussion of the 'no project' alternative."

[118 Cal.Rptr. 249, 529 P.2d 1017]; *City of Livermore* v. *Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 538 [230 Cal.Rptr. 867].) An EIR provides the public and responsible government agencies with detailed information on the potential environmental consequences of an agency's proposed decision. (See generally, *No Oil, supra*, 13 Cal.3d at p. 81; *Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 307 [248 Cal.Rptr. 352].)" (*Mountain Lion Foundation* v. *Fish & Game Com., supra*, 16 Cal.4th 105, 113 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) ▮▮▮ "CEQA also requires the public agency to consider feasible alternatives to the project which would lessen any significant adverse environmental impact. (§§ 21002, 21081; *City of Poway* v. *City of San Diego* (1984) 155 Cal.App.3d 1037, 1045-1046 [202 Cal.Rptr. 366] (hereafter *City of Poway*).) One alternative is 'no project.' (See Guidelines, § 15126, subd. (d)(2) ['no project' alternative to be considered along with proposed project's environmental impact]; *Dusek* v. *Redevelopment Agency* (1985) 173 Cal.App.3d 1029, 1043 [219 Cal.Rptr. 346].)" (*Id.* at p. 123.)

CEQA requires that the no project alternative discussed in an EIR address "existing conditions" as well as "what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services." (Guidelines, former § 15126, subd. (d)(4), now § 15126.6, subd. (e)(2).) The existing conditions, supplemented by a reasonable forecast, are characterized as the no project alternative. The description must be straightforward and intelligible, assisting the decision maker and the public in ascertaining the environmental consequences of doing nothing; requiring the reader to painstakingly ferret out the information from the reports is not enough. (*Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 357 [182 Cal.Rptr. 317]; *Dusek* v. *Redevelopment Agency, supra*, 173 Cal.App.3d 1029, 1043.)

C. *Scope of Review*

CEQA compels process. It is a meticulous process designed to ensure that the environment is protected. Because the EIR is the heart and soul of CEQA, we must assure that CCWA's EIR facilitated the environmental review process as envisioned by CEQA. We are not at liberty to review the economics or politics of water policy. Our task is extraordinarily limited and our focus is narrow. Did the EIR adequately describe the existing conditions and offer a plausible vision of the foreseeable future?

▮▮▮ "Consideration of a filed EIR's adequacy is a judicial function. [Citation.] In a lawsuit charging noncompliance with CEQA, judicial inquiry

is limited to the question of abuse of discretion, which is established if the agency has not proceeded as required by law or if its decision is not supported by substantial evidence. [Citations.] The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].)

"Noncompliance with substantive requirements of CEQA or noncompliance with information disclosure provisions 'which precludes relevant information from being presented to the public agency . . . may constitute prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions.' (§ 21005, subd. (a).) In other words, when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial. [Citations.] [¶] As we explained: 'The trial court may not exercise its independent judgment on the omitted material by determining whether the ultimate decision of the lead agency would have been affected had the law been followed. The decision is for the discretion of the agency, and not the courts.' [Citation.]" (*County of Amador v. El Dorado County Water Agency, supra,* 76 Cal.App.4th at p. 946.)

Our task is the same as that of the trial court. We must review the public agency's actions to determine whether it complied with CEQA. " 'The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it. [Citations.]' [Citation.]" (*Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182, 192-193 [55 Cal.Rptr.2d 625].)

### D. *Analysis*

 There is an aura of unreality surrounding the debate over article 18, subdivision (b). The original long-term contracts set forth the amount of each signatory's entitlement to water under its contract. Defendants acknowledge that the contract entitlements for water from the SWP total about 4.2 maf annually. In DWR Bulletin No. 132-90 (1990), DWR explained that "[t]he measure of the SWP's delivery capability is founded on the concept of 'firm yield' operation. Defined in the water supply contracts as 'minimum project yield', firm yield is the dependable annual water supply that can be made available without exceeding allowable reductions in agricultural deliveries (specified in the water supply contracts) during extended dry periods. . . . The firm yield of existing SWP facilities is approximately 2.4 maf

per year, based on the historical dry period from 1928 through 1934." DWR forthrightly admits that "the State Water Project (SWP) does not have the storage facilities, delivery capabilities, or the water supplies necessary to deliver full amounts of entitlement water." (DWR, Bull. No. 132-91 (1991) p. 100.) The average actual deliveries under SWP over a 14-year period, from 1980-1993, were around 2.0 maf.

There is then no question that the SWP cannot deliver all the water to which contractors are entitled under the original contracts. It does not appear that SWP has ever had that ability. Nor do defendants suggest that full delivery of entitlement water is likely within the life of the contracts. Nevertheless, defendants dispute that a long-term shortage exists. Defendants argue that requests are the proper measure of shortage. They emphasize that the SWP had been able to meet contractors' actual requests for water every year except 1994, suggesting there is no water shortage, let alone a permanent shortage.

Defendants' notion of permanent shortage is belied by the language of article 18, subdivision (b), which speaks in terms of "entitlements," not requests. However, as we have previously explained, it is not our task to resolve the contractual dispute. Indeed, this challenge to the adequacy of an EIR is hardly the appropriate case to resolve such a complex issue of contract law. Even assuming the plausibility of defendants' interpretation of article 18, subdivision (b), and their related factual assertion that requests are unlikely to outstrip supply, plaintiffs posit an equally plausible construction, that article 18, subdivision (b), can be invoked when entitlements and supply are chronically imbalanced. So long as article 18, subdivision (b), can be plausibly construed in a manner that would result in significant environmental consequences, its elimination should be considered and discussed in the EIR. The legal uncertainty surrounding article 18, subdivision (b), and the consequent threat of litigation is not a reason to ignore the provision in assessing the environmental consequences of the project. Litigation, almost by definition, is a speculative, risky business. It is true that no one could know either how long the article 18, subdivision (b), issue would linger in litigation or what the outcome would be. But the threat of litigation cannot be allowed to derail environmental review.

Defendants' arguments miss the mark for a second, more fundamental reason. Were article 18, subdivision (b), to be invoked, annual entitlements set forth in table A of the original contract would "be reduced proportionately by the State to the extent necessary so that the sum of the revised maximum annual entitlements of all contractors will then equal . . . reduced

minimum project yield." This would constitute a major alteration of table A. Nevertheless, defendants suggest it would not appreciably affect actual water delivery practices because few contractors ever request the full amount of their entitlement. Though total entitlements and project yields have always been out of balance, the SWP has nonetheless been able to meet contractor requests except in a few drought years.

What then are the environmental consequences of removing article 18, subdivision (b), if contractors continue to receive the same amount of water whether or not the provision is invoked? The answer is that entitlements under table A—"paper water," so called because it exists only on paper— serve as the basis for land planning decisions.[7] Projects that are given the clearance to proceed based upon an entitlement to X acre-feet of water might not proceed if a contractor's entitlement is reduced to (X minus Y) acre-feet.

Commenters to the draft EIR spoke directly to the issue of land use planning. One commenter pointed out, "Potential environmental effects exist because local land use jurisdictions within SWP Contractors' service areas vary considerably in their planning responses to the availability of project water. Some planning jurisdictions assume that most or all of their SWP entitlement will be available for new development. Others more reasonably assume that they will receive water in proportion to the project's actual yield. Thus, where land use planning determinations can be made on the basis of entitlement rather than real water, development can outpace the availability of water, leading to detrimental environmental consequences, excessive groundwater pumping, and pressure to develop additional water supplies. [¶] While the proposed program alters the manner in which SWP water is allocated, particularly in times of shortage, it does not reduce entitlements to reflect actual water availability. Moreover, the EIR provides no discussion of the environmental consequences associated with land use planning based on project entitlement rather than actual yield."

---

[7] Paper water always was an illusion. "Entitlements" is a misnomer, for contractors surely cannot be entitled to water nature refuses to provide or the body politic refuses to harvest, store, and deliver. Paper water represents the unfulfilled dreams of those who, steeped in the water culture of the 1960's, created the expectation that 4.23 maf of water could be delivered by a SWP built to capacity. And yet those same dreamers had vision. While hoping for a completed SWP, they incorporated the article 18, subdivision (b), mechanism to reduce entitlements to meet a humbler, leaner reality. We agree with plaintiffs that inclusion of article 51 in the amended contracts implies that DWR and the contractors have forsaken their expectation that the SWP facilities will be built as planned and will deliver 4.23 maf of water annually. Article 51 allows contractors a rebate for the costs previously assessed for facilities that have never been built. Indeed, fiscal and environmental pressures militate against completion of the project.

Others reflected the same concern about planning predicated on paper water. One wrote: "[R]eduction of SWP entitlements to acknowledge permanent shortage (or, more accurately, realistic yield) will allow for more accurate forecasting by agricultural and urban water users, and more accurate planning efforts by regulatory authorities and business interests." Similarly, another commented: "Clearly implementation of Article 18(b) would reallocate water based on the existing 'minimum project yield'. DWR has stated in past Bulletin 132s' that the 'firm yield' of the SWP is 2.4 MAF. The current Delta Standards must be figured in to get a reliable number to make up this 'minimum project yield'. This would be a benefit to everyone. [¶] Cities and Counties could plan development based on a reliable water supply. Agriculture (Ag.) would be able to plan and get financing for crops based on 'wet' water not 'paper' promises (ie [*sic*] contractual obligations)." We are not, as defendants suggest, accepting these concerns, opinions, and viewpoints as facts. CEQA does not require scientific certainty before an issue requires study.

The comments merely corroborate the commonsense notion that land use decisions are appropriately predicated in some large part on assumptions about the available water supply. There is certainly the possibility that local decision makers are seduced by contractual entitlements and approve projects dependent on water worth little more than a wish and a prayer. The invocation of article 18, subdivision (b), as well as the possibility that article 18, subdivision (b), might be invoked could therefore affect planning decisions. The trial court's rationale upholding the sufficiency of the no project discussion, a rationale mirrored in defendants' arguments, thus evades the essential analysis required under CEQA. Neither the threat of litigation nor the debate over whether a permanent shortage exists is crucial to the environmental issues posed by CEQA. Quite simply, the question was not whether article 18, subdivision (b), was likely to be implemented in the near future, but what environmental consequences were reasonably foreseeable by retaining or eliminating article 18, subdivision (b)'s solution to a permanent water shortage.

Members of the public, under the auspices of CEQA, urged CCWA to study the environmental impacts of the no project alternative, including the impact on land use planning. CCWA simply failed to fulfill its mandate to present a complete analysis of the environmental consequences of implementing article 18, subdivision (b). Two cases from Stanislaus County are instructive.

In *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713 [32 Cal.Rptr.2d 704], the Court of Appeal found

the EIR legally inadequate because it did not include a sufficient description of the existing environmental setting of the site and the surrounding area, it ignored a necessary element of the development project, and it failed to explore alternative sites and cumulative impacts. The court reversed the judgment denying the petition for a writ of mandate and remanded the case to the superior court. ■ The court stated: " '[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decisionmakers, and the public, with the information about the project that is required by CEQA.' (*Santiago County Water Dist.* v. *County of Orange* (1981) 118 Cal.App.3d 818, 829 [173 Cal.Rptr. 602].) The error is prejudicial 'if the failure to include relevant information precludes informed decision-making and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citation.]" (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra,* 27 Cal.App.4th at pp. 721-722.)

Similarly, in *Stanislaus Natural Heritage Project v. County of Stanislaus, supra,* 48 Cal.App.4th 182, the Court of Appeal reversed the judgment denying the petition for a writ of mandate asking the superior court to set aside the certification of the EIR. The Court of Appeal found the program EIR deficient because it failed to address the procurement and impacts of a permanent water supply. The court explained: "The County in essence approved an EIR for a 25-year project when water for the project had not been assured beyond the first 5 years of the 15-year first phase of the project. The County knew neither the source of the water the project would use beyond the first five years, nor what significant environmental effects might be expected when the as yet unknown water source (or sources) is ultimately used." (*Id.* at p. 195.)

The court concluded: "In our view, the County's approval of the project under these circumstances defeated a fundamental purpose of CEQA: to 'inform the public and responsible officials of the environmental consequences of their decisions before they are made.' [Citations.] The CEQA EIR process 'protects not only the environment but also informed self-government.' " (*Stanislaus Natural Heritage Project v. County of Stanislaus, supra,* 48 Cal.App.4th at p. 195.) Although neither Stanislaus County case suffered the same defect as the EIR before us, both EIR's failed their essential mission under CEQA to present a full disclosure of the potential environmental impacts of the proposal. In the same way, CCWA's EIR is deficient. ■ By failing to provide a thorough examination of the no project alternative, CCWA has undermined the most basic charge under CEQA—to inform the decision maker.

E. *Explanation of Article 18, Subdivision (b), as an Infeasible Alternative*

Defendants attempt to save the EIR with a second explanation. They contend that implementation of article 18, subdivision (b), was adequately explained in the final EIR as an alternative and rejected because it did not meet the objectives of the Monterey Agreement. The brief discussion in the final EIR fails to meet several criteria set forth in CEQA.

 "CEQA and the Guidelines are replete with references to the need for a discussion of project alternatives." (*Laurel Heights, supra,* 47 Cal.3d at p. 400; Pub. Resources Code, §§ 21001, subd. (g), 21002.1, subd. (a), 21061, 21100, subd. (b)(4); Guidelines, former § 15126, subd. (d); especially subd. (d)(3).) An EIR must "[d]escribe a range of reasonable alternatives to the project, or to the location of the project, which would feasibly attain most of the basic objectives of the project . . . and evaluate the comparative merits of the alternatives." (Guidelines, former § 15126, subd. (d), now § 15126.6, subd. (a).) The discussion must "focus on alternatives capable of eliminating any significant adverse environmental effects or reducing them to a level of insignificance, even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly." (Guidelines, former § 15126, subd. (d)(3).) "The sufficiency of the information contained in an EIR is reviewed in the light of what is reasonably feasible." (*Kings County Farm Bureau v. City of Hanford, supra,* 221 Cal.App.3d 692, 733.) The discussion of alternatives must be judged against a rule of reason. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 565 [276 Cal.Rptr. 410, 801 P.2d 1161].)

 Responding to the onslaught of criticism of the draft EIR for failing to discuss implementation of article 18, subdivision (b), CCWA responded to the public comments by evaluating article 18, subdivision (b), as an alternative. The response states: "These comments misinterpret the overall purposes of the Monterey Agreement and the effects of attempting to implement Article 18(b) in lieu of implementing the Agreement. Implementation of Article 18(b) was found not to be a feasible alternative." The response discloses a fundamental misconception of the public's comments and the difference between a no project description and an evaluation of feasible alternatives.

A no project description is nonevaluative. It provides the decision makers and the public with specific information about the environment if the project is not approved. It is a factually based forecast of the environmental impacts of preserving the status quo. It thus provides the decision makers with a base

line against which they can measure the environmental advantages and disadvantages of the project and alternatives to the project.

By contrast, the discussion of alternatives is evaluative. Measured by the rule of reason, the feasibility of various alternatives is considered. But the essential ingredient in determining feasibility is the assessment of the alternative in relation to the objectives of the project. This is the threshold flaw in the response to the comments urging consideration of the implementation of article 18, subdivision (b). The public was not asking for an evaluation as to whether article 18, subdivision (b), would meet DWR and the contractors' objective to avoid litigation. In CEQA vocabulary, the public did not request an alternatives analysis with the lens focused on the objectives of the project. What the public requested, and CEQA demanded, was an objective recitation of the environmental impact of implementing the existing contractual mechanism for eliminating paper water. The response failed to provide the public agencies that would use the EIR to decide whether or not to amend their contracts, and their constituencies, with a straightforward analysis of the environmental consequences of implementing article 18, subdivision (b). "The vice of this 'mulligan stew' approach to environmental document drafting is that it jumbles several important concepts, each having a different meaning and each entitled to separate consideration." (*Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1404 [61 Cal.Rptr.2d 297].)

Moreover, even as an alternative, the discussion of article 18, subdivision (b), is deficient. Only a cursory analysis is provided in three short paragraphs wherein the drafters explain other contractual provisions that would minimize the effect of implementing article 18, subdivision (b), as follows: "[Article 18, subdivision (b)] is closely linked with Articles 6(c), 16(b), 18(d) and 21 of the water supply contracts. Article 6(c) requires the State, subject to the availability of funds, to make all reasonable efforts, consistent with certain prerequisites, to complete the project facilities in such a manner that the contractors' Table A entitlements can be provided. Article 16(b) requires the State to make all reasonable efforts to perfect and protect water rights necessary to protect water supply commitments. These obligations would not be terminated or modified if the State declared a permanent shortage under Article 18(b). This is made clear by Article 18(d) which allows reinstatement of reductions that occur in Table A entitlements under Article 18(b). Thus, implementation of Article 18(b) would not eliminate the possibility that, in the future, the State would construct additional facilities or take other actions to increase the yield of the project.

"In addition, implementation of Article 18(b) would not reduce the amount of water which the State would have available from storage or from

natural flows through the Sacramento-San Joaquin Delta to deliver to the contractors. The amount of water available is not dependent on the Table A entitlements, but on natural hydrologic variations and the capacities of the existing project facilities. If Table A entitlements were adjusted, less entitlement water would be delivered and more surplus water would be available pursuant to Article 21. The total amount of water available to all contractors would remain essentially unchanged.

"Because of the continuing existence of Articles 6(c), 18(d), and 21, declaring a permanent shortage under Article 18(b) would not have the water supply or future project construction results postulated by several Commenters."

This response does little more than acknowledge the paper commitment to build SWP facilities and the obvious fact that the hopes and dreams upon which the entitlements are based do not create a greater annual supply of water. None of the commenters suggested that implementation of article 18, subdivision (b), altered the contractual and political commitment to complete the SWP. They did, however, suggest that the elimination of paper water would impact land planning decisions that might reduce the need for as many SWP facilities. Under that scenario, article 18, subdivision (d), might not be invoked nor would surplus water under article 21 be tapped and exhausted.

We need not venture into speculation. But CEQA does compel reasonable forecasting. (*Laurel Heights, supra,* 47 Cal.3d at pp. 398-399; *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1144 [58 Cal.Rptr.2d 152].) Here, there were repeated requests for DWR to provide forecasts based on simulation models it used in the preparation of other EIR's. This EIR lacks any projections relating to land planning, demand for water, or other environmental impacts of reducing entitlements pursuant to article 18, subdivision (b). The discussion is confined solely to a synopsis of other contractual provisions and a summary dismissal of the essence of the public's articulated concern about deleting article 18, subdivision (b).

Hence, the response to article 18, subdivision (b), as an infeasible alternative missed the essential concern expressed by interested members of the public. The Supreme Court provided an apt critique of a public agency similarly misdirected. In *Laurel Heights, supra,* 47 Cal.3d 376, the court wrote: *"The Regents miss the critical point that the public must be equally informed.* Without meaningful analysis of alternatives in the EIR, neither the courts nor the public can fulfill their proper roles in the CEQA process. We

do not impugn the integrity of the Regents, but neither can we countenance a result that would require blind trust by the public, especially in light of CEQA's fundamental goal that the public be fully informed as to the environmental consequences of action by their public officials. 'To facilitate CEQA's informational role, the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions.' [Citations.] An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Id.* at pp. 404-405.)

Perhaps the deficiencies in the EIR relate to the provincial experience of the lead agency, a topic we addressed earlier. We conclude the EIR failed to meet the most important purpose of CEQA, to fully inform the decision makers and the public of the environmental impacts of the choices before them. A new EIR must, therefore, be drafted.

In view of our earlier conclusion that DWR must serve as lead agency under CEQA, we need not, as we ordinarily would, address the other alleged deficiencies in this EIR. (Pub. Resources Code, § 21005, subd. (c).) We need not hypothesize on the remaining issues because DWR, with its expertise on the statewide impacts of water transfers, may choose to address those issues in a completely different and more comprehensive manner.

III

*Validation Cause of Action*

A. *Introduction*

 Plaintiffs' fifth cause of action in the first amended complaint seeks to invalidate DWR's transfer of the Kern Fan Element and amendment of water supply contracts pursuant to the Monterey Agreement as violations of the nonalienation mandate of Water Code section 11464. Section 11464 expressly provides that "[n]o water right, reservoir, conduit, or facility for the generation, production, transmission, or distribution of electric power, acquired by the department shall ever be sold, granted, or conveyed by the department so that the department thereby is divested of the title to and ownership of it." The trial court granted defendants' motion for summary adjudication of the validation cause of action, ruling that the state water contractors, whose motions to quash service of summons had been granted, were indispensable parties to the validation action.

We will conclude the trial court's ruling quashing service deprived the court of in personam jurisdiction of the water contractors; they could not be

joined as parties in the validation proceedings. However, "A validating proceeding differs from a traditional action challenging a public agency's decision because it is an in rem action whose effect is binding on the agency and on all other persons." (*Millbrae School Dist. v. Superior Court* (1989) 209 Cal.App.3d 1494, 1497 [261 Cal.Rptr. 409].) Consequently, the ruling on the motion to quash did not, and could not, resolve the issue presented by the motion for summary adjudication, viz., whether the court had in rem jurisdiction to determine the validity of DWR's actions after all interested parties were given proper notice.

The very purpose of an in rem action is to provide a binding judgment against the world. A motion to quash service, by contrast, is an attack on in personam jurisdiction. Hence, the fact that the service of summons on 14 water contractors was quashed means they cannot be joined in the proceedings, but it is of no consequence in determining whether plaintiffs established in rem jurisdiction.

The motion for summary adjudication, not the motion to quash, raises the dispositive issue whether the trial court had jurisdiction to adjudicate the validity of DWR's contract to divest itself of the Kern Fan Element and of the amended contracts DWR signed implementing the terms of the Monterey Agreement. The specificity of the validation statutes provides the answer.

B. *Analysis*

The statutory requirements to establish jurisdiction over the res in validation proceedings is set forth at section 860 et seq. of the Code of Civil Procedure.[8] Section 860 provides that a "public agency may upon the existence of any matter which under any law is authorized to be determined pursuant to this chapter . . . bring an action . . . to determine the validity of such matter. The action shall be in the nature of a proceeding in rem."

The term "public agency" refers to the agency seeking a determination of the validity of its action. It does not refer to other parties that may be interested in the outcome of the action. Code of Civil Procedure section 861 encompasses these interested parties. It provides that "[j]urisdiction of all interested parties may be had by publication of summons . . . in the county where the action is pending," to wit, all interested parties whether public or private, other than, of course, the public agency that brings the action. (*Ibid.*)

---

[8]An in rem proceeding under section 860 et seq. may be brought under Government Code sections 53511 and 17700 "to determine the validity of [a state agency's] '. . . contracts . . . .' " (*Planning & Conservation League I, supra,* 17 Cal.4th at p. 269; see also Wat. Code, § 35855.)

The use of the term "jurisdiction" in this context is deceptive. Since jurisdiction is necessary over the res, not over persons, in a validation proceeding, section 861 of the Code of Civil Procedure is in essence a notice provision. Interested persons must have notice by publication of summons before the court can obtain in rem jurisdiction of the validation action.

Code of Civil Procedure sections 860 and 861 apply to validation proceedings initiated by the public agency whose action is at issue. The legislative scheme of which the two statutes are component parts also authorizes proceedings by nonagency parties. Such an action is covered by section 863 of the Code of Civil Procedure and is sometimes called a "reverse validation action." (*County of Riverside v. Superior Court* (1997) 54 Cal.App.4th 443, 445 [62 Cal.Rptr.2d 747].) Section 863 states: "If no proceedings have been brought by the public agency pursuant to this chapter, any interested person may bring an action . . . to determine the validity of such matter." Read in context, the "public agency" referred to in section 863 is necessarily the same public agency referred to in section 860 or, in other words, the agency whose action is to be tested or validated. And it is only that public agency that, pursuant to section 863, "shall be a defendant and shall be served with the summons and complaint in the action . . . ."[9] It is uncontested that DWR is the public agency whose actions are challenged and that it was properly served pursuant to section 863. All the other (potential) parties to the action are deemed "interested parties" over whom jurisdiction may be had by publication of summons. (Code Civ. Proc., §§ 861, 861.1.) That, too, was done in this case.[10] Accordingly, by virtue of section 861, the court had jurisdiction over the res of DWR's actions and could adjudicate its contract to convey the Kern Fan Element and its amended contracts implementing the Monterey Agreement.[11]

Defendants insist that the trial court's ruling on the motion to quash resolved the jurisdictional question, including jurisdiction in rem, adversely to the plaintiffs, who are now, they claim, precluded from raising the issue in this appeal. They mistakenly blur the distinction between the motion for

---

[9]Defendants erroneously refer to "public agencies" in the plural, whereas the validation statutes explicitly refer only to the singular form, "the public agency." (Code Civ. Proc., §§ 860, 863.)

[10]Other interested parties, including KCWA, were not only subject to the publication of summons in the county in which the action was filed, but were personally served with a copy of the summons.

[11]Plaintiffs do not, as defendants allege, claim the unnamed water contractors were not indispensable because they received actual notice of the validation proceeding. Rather, it is plaintiffs' position that the contractors were properly served as "interested persons" and they were not indispensable because the court had in rem jurisdiction.

summary adjudication and the motions to quash service of process.[12] The two motions involved different parties and achieved very different results.[13]

KCWA and 11 other water contractors moved to quash service of summons on the ground that as public agencies they must be named and served in the manner provided by the Code of Civil Procedure for service of summons on a defendant in a civil action. The trial court agreed and quashed service. Plaintiffs appealed. We dismissed the appeal from the order quashing service as untimely. The Supreme Court affirmed our dismissal in *Planning & Conservation League I, supra,* 17 Cal.4th 264. At oral argument, defendant CCWA argued that the trial court's ruling, including its rationale, is law of the case, thereby foreclosing our review of the service necessary to achieve in rem jurisdiction in validation proceedings. Defendants misunderstand law of the case.

■ "The doctrine of 'law of the case' deals with the effect of the *first appellate decision* on the subsequent *retrial or appeal:* The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 895, p. 928.) ■ In *Planning & Conservation League I,* the Supreme Court did not review whether the trial court's interpretation of Code of Civil Procedure section 863 is correct, that is, whether the language of the statute "[t]he public agency shall be a defendant and shall be served with the summons and complaint" applies not only to the public agency whose action is challenged but to all public agencies that have contracts with the decisionmaking agency. The Supreme Court ruled only on the narrow procedural question as to whether the filing of the appeal was timely. Consequently, the only rule of law binding on us under the doctrine of law of the case is the timeliness issue.

Defendants insist that the finality of the order quashing service exonerates the water contractors. We agree that the Supreme Court's affirmance of the order quashing service means those water contractors cannot be joined as

---

[12]Defendants repeatedly mischaracterize plaintiffs' appeal of the dismissal of the validation action. Although plaintiffs clearly appeal *only* the granting of the motion for summary adjudication, defendants write, "Section III of the Appellant's Opening brief attacks the trial court rulings that led to dismissal of Appellants' Fifth Cause of Action." Again referring to the trial court rulings, defendants state, "Appellants attack the trial court rulings on two grounds." Such obfuscation lays the groundwork for defendants' contention that plaintiffs are attempting to appeal issues they should have timely appealed. It is essential to keep the motions to quash conceptually distinct from the motion for summary adjudication.

[13]Defendants do not raise res judicata or its variant, collateral estoppel, in this appeal. We need not, therefore, ponder those possibilities.

parties to the validation action. But that is all it means. The case does not finally dispose of the issues raised by the appeal of the order granting summary adjudication of the validation cause of action.[14] Moreover, none of the water contractors are parties to this lawsuit and, therefore, they were not parties to the motion for summary adjudication—the issue on this appeal.

Defendants urge us not to allow a "back door" appeal of issues that could have been raised if the appeal of the order granting the motion to quash had been timely. Certainly section 906 of the Code of Civil Procedure forecloses review of an order "from which an appeal might have been taken." We are not, however, reviewing the motion to quash. Thus, our review of the merits of the ruling on the summary adjudication is not comparable to the attempt of the plaintiff in *League to Save Lake Tahoe v. Tahoe Regional Planning Agency* (1980) 105 Cal.App.3d 394, 399 [164 Cal.Rptr. 357] to secure review of the trial court's order granting the motions of the real parties in interest to quash service of summons. The plaintiff failed to appeal the order but argued in its appeal from the judgment in favor of the respondents that the real parties, by filing a reply brief in which they argued the merits of in personam jurisdiction, had submitted themselves to the jurisdiction of the California courts. We rebuffed such a transparent attempt to obtain review of an order the plaintiff had failed to appeal. Here, of course, plaintiffs make no attempt to secure in personam jurisdiction over the water contractors. It is only within the unique context of an in rem validation proceeding that the court obtained in rem jurisdiction once service by publication was properly accomplished.[15]

The question thus posed is what impact does the failure to personally serve the water contractors have on the viability of the validation action? Defendants contend that these contractors are indispensable parties within the meaning of section 389 of the Code of Civil Procedure, even though a validation proceeding is an action in rem. Emphasizing the in rem nature of

[14]Apparently, the majority in *Planning & Conservation League I* agrees, as the following dicta suggests: "Finally, because the legal questions raised by the dismissed appeal overlap substantially with those raised by plaintiffs' still-pending appeal from the final judgment, we are unconvinced dismissal of the appeal from the order quashing service will deprive plaintiffs of ' "any remedy whatsoever." ' " (*Planning & Conservation League I, supra*, 17 Cal.4th at p. 274.)

[15]Defendants assert that if we accept plaintiffs' argument to review the jurisdictional question based on whether service on the contractors was sufficient, then the attempt to appeal the order to quash service was a futile act. We disagree. Plaintiffs may have had many motives for appealing what they believed was an erroneous ruling. They are not precluded from appealing a judgment based on antecedent rulings merely because we may reach an opposite conclusion. In hindsight, the filing of the first appeal may have been unnecessary, but plaintiffs' motives or appellate strategy have no bearing on the propriety of our review of the issues presented by the appeal of the final judgment.

the validation proceeding, plaintiffs contend there are no indispensable parties beyond the public agency whose action is challenged. We agree.

"In the context of a challenge to a municipal annexation, the court in *Hills for Everyone* v. *Local Agency Formation Com.* (1980) 105 Cal.App.3d 461 [164 Cal.Rptr. 420], listed the reasons for requiring in rem actions: 'Important policy considerations underlie the . . . requirement that a completed annexation be tested by an in rem proceeding under the validating statute . . . . A uniform procedure for prompt resolution of the validity of a completed annexation by an in rem action is necessary in order to settle any questions respecting the city's jurisdiction over the annexed territory, including any uncertainties respecting the applicable land use regulations, or the city's responsibility to provide police, fire and other municipal services to the area. The procedure prescribed by the validating statute assures due process notice to all interested persons and settles the validity of the annexation once and for all by a single lawsuit.' [Citation.]" (*Committee for Responsible Planning* v. *City of Indian Wells* (1990) 225 Cal.App.3d 191, 197 [275 Cal.Rptr. 57].)

Similarly, a reverse validation action affords interested persons the opportunity to promptly challenge the pending action by a public agency. Here no one disputes that the water contractors were given both published and actual notice of the validation action. As explained above, the court obtained jurisdiction over the res because the service of the water contractors, as interested persons, was effective. And as long as service is effective on the target public agency, other interested persons, by definition under the validation statutes, cannot be indispensable. Hence, it is incongruous to conclude, as defendants do here, that the voluntary absence of interested persons, with both constructive and actual notice of the proceedings, would compel dismissal of the proceedings. The cases argued by defendants certainly do not support such an anomalous result.

*Sierra Club, Inc.* v. *California Coastal Com.* (1979) 95 Cal.App.3d 495 [157 Cal.Rptr. 190] and *Beresford Neighborhood Assn.* v. *City of San Mateo* (1989) 207 Cal.App.3d 1180 [255 Cal.Rptr. 434] (*Beresford*) both involved nonjoined developers in suits to set aside either building permits or zoning and planning approvals. The courts found the developers were indispensable parties because the legal attack was on a specific development plan as distinguished from a plan, such as a general plan, which "will apply equally to all developments in the area." (*Beresford, supra,* 207 Cal.App.3d at p. 1189.) Similarly, in *Save Our Bay, Inc.* v. *San Diego Unified Port Dist.* (1996) 42 Cal.App.4th 686 [49 Cal.Rptr.2d 847], the court found that the landowner whose land had to be acquired to complete the project was an indispensable party in the action challenging the sufficiency of the environmental impact report for the project. (*Id.* at p. 693.)

None of these cases involve validation proceedings. Had the courts allowed the lawsuits to proceed in the absence of the developers or landowners, the ensuing judgments would have been subject to collateral attack and would have exposed the decision makers to the risk of incurring inconsistent obligations. Code of Civil Procedure, section 870, one of the validation statutes, precludes such a collateral attack. Section 870, subdivision (a), provides: "The judgment, if no appeal is taken, or if taken and the judgment is affirmed, shall, notwithstanding any other provision of law including, without limitation, Sections 473 and 473.5, thereupon become and thereafter be forever binding and conclusive, as to all matters therein adjudicated or which at that time could have been adjudicated, against the agency and against all other persons, and the judgment shall permanently enjoin the institution by any person of any action or proceeding raising any issue as to which the judgment is binding and conclusive."

The trial court erred by ruling that the dismissed contractors were indispensable. As a consequence, the judgment granting the summary adjudication of the fifth cause of action must be reversed.

### DISPOSITION

We reverse the judgment and remand the cause to the trial court. The trial court shall vacate the summary adjudication order on the fifth cause of action, issue a writ of mandate vacating the certification of the EIR, and determine the amount of the attorney fees to be awarded to plaintiffs. The trial court shall consider such orders it deems appropriate under Public Resources Code section 21168.9, subdivision (a), consistent with the views expressed in this opinion, and shall retain jurisdiction over this action until DWR certifies an EIR in accordance with CEQA standards and procedures that meets the substantive requirements of CEQA.[16] Plaintiffs shall recover their costs on appeal.

Blease, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied October 16, 2000, and the opinion was modified to read as printed above. The petition of appellant Department of Water Resources and respondent Central Coast Water Authority for review by the Supreme Court was denied December 13, 2000.

---

[16]We earlier declined to stay implementation of the Monterey amendments and transfer of the Kern Fan Element. Consequently, the project was permitted to proceed pending disposition of this appeal. The record does not reflect the current status of the project and, in the absence of such information, we shall issue no orders concerning further implementation of the project. The trial court, acting under the authority provided by Public Resources Code section 21168.9, is the more appropriate forum to consider and rule upon requests to enjoin all or portions of the project pending the completion of administrative and judicial proceedings necessitated by our opinion.