Filed 3/30/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SAVE THE HILL GROUP,<br>    Plaintiff and Appellant,<br>v.<br>CITY OF LIVERMORE,<br>    Defendant and Respondent;<br>LAFFERTY COMMUNITIES, INC.,<br>    Real Party in Interest and<br>Respondent. | A161573<br><br>(Alameda County<br>Super. Ct. No. RG19020186) |

This appeal is from a superior court judgment denying a petition for writ of mandate filed by appellant, Save the Hill Group (Save the Hill), a private group of concerned residents, against respondents, developer and real party in interest, Lafferty Communities, Inc. (Lafferty),[1] and the City of Livermore (City). Save the Hill seeks to have set aside the City's decisions to approve a residential housing development project known as the Garaventa Hills Project (the Project) and to certify a reissued final environmental impact report (RFEIR) under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 2100 et seq.).[2]

---

[1] Lafferty was formerly known as Livermore LT Venture I Group, LLC.

[2] Unless otherwise stated, all statutory citations herein are to the Public Resources Code. Subsequent references to "Guidelines" are to the

For reasons that follow, we conclude Save the Hill has raised a challenge to the adequacy of the RFEIR's analysis of the "no project" alternative that is both preserved for appeal and meritorious. The RFEIR's certification and the Project's approval therefore cannot stand. Accordingly, we reverse and remand to the superior court for further proceedings consistent with the opinion set forth *post*.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.    *The Project and Project Site.***

On July 27, 2011, Lafferty submitted a development application for 76 homes on a 31.7-acre project site in the Garaventa Hills that is the last remaining undeveloped area in that section of the City of Livermore (hereinafter, Project Site). The initial proposed development included a looped roadway system and a two-way vehicular and pedestrian connector bridge over Altamont Creek, which crosses the Project Site. On November 16, 2011, the City issued a notice of preparation of a draft environmental impact report (DEIR), which was published a year later, in November 2012.

The DEIR described the Project Site, known as Garaventa Hills, as "moderately steeply sloping" with two prominent knolls at the center and an intermittent stream channel, Altamont Creek, at the southern boundary. Garaventa Hills consists of predominately non-native grassland habitat. West of the Project Site is the 24-acre Garaventa Wetlands Preserve, owned and managed by the Livermore Area Recreation and Park District (LARPD). The Project Site, together with the Garaventa Wetlands Preserve, provides habitat for a variety of special-status species protected under the California

_____

CEQA guidelines found in California Code of Regulations, title 14, section 15000 et seq.

Endangered Species Act and/or the federal Endangered Species Act. These species include the California red-legged frog, California tiger salamander, California burrowing owl, San Joaquin kit fox, western spadefoot toad, vernal pool fairy shrimp, Livermore tarplant, palmate-bracted bird's beak, and Congdon's tarplant.

The area of the Garaventa Hills and Wetlands Preserve is hydrologically connected to the Springtown Alkali Sink, a unique alkaline wetlands area owned and managed by the Wetlands Exchange in cooperation with the City, the California Department of Fish and Wildlife (CDFW), and the U.S. Fish and Wildlife Service (USFWS). The DEIR recognized that any alterations to existing drainage patterns in the Garaventa Hills may affect the quantity, timing and quality of precipitation that enters these wetlands and which is needed to maintain a functioning ecosystem.

When comments on the DEIR were solicited from the public, it became clear there was considerable opposition to Lafferty's original proposal. Lafferty therefore altered course and proposed a more modest project that reduced the number of residential units from 76 to 47, eliminated the vehicular bridge, and preserved a large rock outcropping. The City then released a final environmental impact report (FEIR) in June 2014.

On July 1, 2014, the City's planning commission recommended that the city council reject Lafferty's second proposal due to concerns about grading, aesthetics and comments by the LARPD regarding compatibility with the Garaventa Wetlands Preserve. The city council agreed and, on September 14, 2015, declined to certified the FEIR or approve Lafferty's second proposed project.

Lafferty, therefore, returned to the drawing board and, on September 8, 2017, submitted a revised application. This smaller-scale project consisted of

3

44 new residences, and a pedestrian bridge across Altamont Creek that would also serve as a secondary emergency vehicle access (EVA) road. In August 2018, the City published the RFEIR. According to the RFEIR, the project would result in the permanent removal of 31.78 acres of grasslands with an additional 1.18 acres being temporarily disturbed for construction of the pedestrian bridge and EVA road. To address these and other environmental impacts, various mitigation measures were proposed, including acquisition of an 85-acre compensatory mitigation site (the Bluebell site) located in the Springtown Alkali Sink.

## II.     *The Approval and RFEIR Certification Process.*

On August 23, 2018, the City held a neighborhood meeting to discuss the revised Project. On December 4, 2018, the planning commission then conducted a public hearing to consider the RFEIR. Afterward, the planning commission unanimously agreed to recommend that the city council approve the RFEIR with a few changes, including a reduction in the number of proposed residences from 47 to 44.

On April 22, 2019, the city council held a public hearing on the RFEIR with the planning commission's proposed changes. After the planning commission presented the RFEIR and numerous citizens, including representatives of Save the Hill, commented on it, the city council adopted a resolution certifying the RFEIR and approving the Project that is now before us. The following day, the City filed its notice of determination.

## III.     *The Petition.*

On May 23, 2019, Save the Hill filed a petition for writ of mandate (petition) asserting causes of action for, among other things, failure to consider significant environmental impacts, to adequately investigate and evaluate the no-project alternative to the Project, and to mitigate significant

4

environmental impacts. Save the Hill asked the superior court to set aside and vacate the Project's approval and certification of the RFEIR and to order the City to prepare a legally adequate environmental impact report (EIR). The administrative record was lodged on September 5, 2019, and a hearing was set for January 10, 2020.

## IV. *The Superior Court's Order.*

On January 16, 2020, the superior court issued a tentative order finding the RFEIR's determination of infeasibility for the no-project alternative inadequate because it failed to disclose and evaluate the possibility of using existing mitigation funding to make the no-project alternative feasible. The court then asked for supplemental briefing on the issue whether Save the Hill exhausted its administrative remedies in challenging the RFEIR as inadequate on this basis.

On April 20, 2020, the superior court issued its final order denying Save the Hill's petition. Judgment was entered in respondents' favor on September 23, 2020. This appeal followed.

## DISCUSSION

Save the Hill contends the superior court erred by finding that it failed to exhaust administrative remedies before raising a legal challenge to the adequacy of the RFEIR's evaluation of the possibility of having no project as a reasonable alternative to the Project. Additionally, Save the Hill contends the City violated CEQA by certifying an RFEIR that failed to: (1) adequately evaluate the no-project alternative; (2) adequately evaluate or mitigate the Project's environmental impacts on the threatened vernal pool fairy shrimp and the hydrologically significant Springtown Alkali Sink; (3) identify appropriate compensatory mitigation for the permanent loss of about 32 acres of seasonal wetlands; and (4) evaluate the possibility of preserving Garaventa

5

Hills as a means to meet the City's unrelated contractual obligations to acquire environmentally significant properties to mitigate the environmental harms of other projects. We begin with the relevant law.

## I. *The CEQA Framework.*

The Legislature intended CEQA " ' "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511 (*Sierra Club*).) " ' "[T]he purpose of CEQA is to protect and maintain California's environmental quality. With certain exceptions, CEQA requires public agencies to prepare an EIR for any project they intend to carry out or approve whenever it can be fairly argued on the basis of substantial evidence that the project may have a significant environmental effect . . . ." [Citation.] The California Supreme Court has "repeatedly recognized that the EIR is the 'heart of CEQA.' [Citations.] 'Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions before they are made. Thus, the EIR "protects not only the environment but also informed self-government." ' " ' ([Citation], quoting *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502].)" (*California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 186 (*California Clean Energy*).)

An EIR is "an informational document" designed "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (§ 21061, 2d par.; Guidelines, § 15003, subds. (b)–(e).) " 'Because the EIR must be certified or rejected by

6

public officials, it is a document of accountability.' " (*Sierra Club, supra*, 6 Cal.5th at p. 512.) The general public, " 'being duly informed, can respond accordingly to action with which it disagrees.' " (*Ibid*.)

An interested party may enforce a public agency's compliance with CEQA by petitioning the superior court for issuance of a writ of mandate. (Pub. Resources Code, §§ 21168.9, subd. (b), 21177; Code Civ. Proc., § 1086 [for standing to seek writ of mandate, party must be "beneficially interested" in the litigation's subject matter].) "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case . . . is the same as the trial court's: [We] review[] the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo.' [Citations.] We therefore resolve the substantive CEQA issues on which we granted review by independently determining whether the administrative record demonstrates any legal error by the [agency] and whether it contains substantial evidence to support the [agency's] factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) " '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence.' " (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935 (*Banning*).)

" 'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the

7

ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' " (*Sierra Club, supra*, 6 Cal.5th at p. 512.) "The ultimate inquiry, as case law and the CEQA guidelines make clear, is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Id*. at p. 516.) This inquiry is generally a mixed question of law and fact subject to de novo review, but to the extent factual questions predominate, a substantial evidence review applies. (*Ibid.*)

**II. *The superior court erred in finding Save the Hill failed to exhaust its administrative remedies before challenging the no-project alternative analysis.***

The superior court rejected Save the Hill's challenge to the adequacy of the no-project alternative analysis on the procedural ground of failure to exhaust administrative remedies. Specifically, the court found that while Save the Hill representatives "express[ed] their desires that the site be preserved as open space," they did not mention the environmental documents or express concern that the City insufficiently studied project alternatives. As discussed *post*, CEQA does not require public interest groups such as Save the Hill, which often are unrepresented by counsel at administrative hearings, to do more than fairly apprise the agency of their complaints in order to preserve them for appeal.

When preparing an EIR, CEQA " 'requires the public agency to consider feasible alternatives to the project which would lessen any significant adverse environmental impact. (§§ 21002, 21081; [citation].) One alternative is "no project." (See Guidelines, § 15126, subd. (d)(2) ["no project" alternative to be considered along with proposed project's environmental impact]; [citation].)'

8

[Citation.]" (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 911 (*Planning & Conservation League*).) Here, Save the Hill contends the RFEIR's evaluation of the no-project alternative was deficient. The superior court agreed but, nonetheless, found Save the Hill forfeited the right to challenge the no-project alternative evaluation by failing to raise a proper objection during the administrative process. We review the court's finding de novo. (*Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 185.) The following rules apply.

" 'In order to attack a decision that is subject to CEQA, the alleged grounds for noncompliance must have been presented to the public agency, and the person attacking the decision must have raised some objection during the administrative proceedings. (§ 21177, subds. (a), (b).)' [Citation.] Although an issue must first have been raised during the administrative process to be preserved for judicial review, it may be argued in court by a different person. [Citation.]" (*California Clean Energy, supra*, 225 Cal.App.4th at p. 191.) " '[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them.' [Citation.] This requirement is known as the exhaustion doctrine. [Citation.] The rationale behind this rule is that the public agency should have the opportunity to receive and respond to articulated factual issues and legal theories before its actions are subjected to judicial review. [Citation.]" (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 909–910 (*Porterville Citizens*).)

Generally speaking, " ' " 'bland and general references to environmental matters' " ' " or " ' " 'isolated and unelaborated' " ' " comments do not satisfy the exhaustion requirement; rather, the " ' " 'exact issue' " ' " must have been

9

presented to the agency. (E.g., *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 623, 631 [plaintiff failed to exhaust administrative remedies where its letters during the administrative process failed to apprise the agency of any specific inconsistencies with the plan's policies or programs]; *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 347 (*South of Market Community Action*) [plaintiffs' remarks during the public comment period that reflected "general concerns about the amount of wind generated by the 5M Project, 'wind tunnel' effects, and requests for mitigation measures" were "insufficient to raise the specific issues [they] assert[ed] on appeal"].) At the same time, courts have acknowledged less specificity is required to preserve an issue for appeal in an administrative proceeding than in a court proceeding because parties are not generally represented by counsel before administrative bodies: " ' " 'To hold such parties to knowledge of the technical rules of evidence and to the penalty of waiver for failure to make a timely and specific objection would be unfair to them.' " ' " (*Santa Clarita Organization for Planning the Environment v. City of Santa Clarita* (2011) 197 Cal.App.4th 1042, 1051; see *Planning & Conservation League v. Castaic Lake Water Agency* (2009) 180 Cal.App.4th 210, 251 (*Castaic Lake*) [to satisfy exhaustion doctrine, petitioner's objections need only " 'fairly apprise[]' " the agency of the EIR's purported defect].)

We conclude on this record Save the Hill's objections during the administrative process met this standard of fairly apprising the City of the RFEIR's failure to adequately flesh out the feasibility of not going forward with the Project. For example, during the public comment period, Carolyn Morgan wrote the City to express concern for "the destruction of habitat

10

when the hill is bulldozed to make suitable building pads" and to ask whether Lafferty owned other land in the City "more suitable for building." Morgan then queried whether "[Lafferty] could sell the development credits to another builder in a more suitable area" so that "the habitat would be saved of [*sic*] forever." In RFEIR comment H-2, the City responded by specifically directing Morgan to the no-project/no-development alternative evaluation, which indicated the Project Site is zoned for residential development and that the Project's habitat-loss impact would be mitigated to insignificant levels.

In addition, during the April 22, 2019 city council meeting at which the RFEIR was presented for certification, several Save the Hill representatives objected to the Project and voiced support for the alternative of preserving the Project Site as open space in perpetuity. For example, Michelle Mitchell asked, " 'Is it possible that during [a future] General Plan reevaluation the City can take the time to look once again to rezoning this property so that it might remain open space? Given the City's history of preserving open space and hillsides, the City's current General Plan, and the City's work with the Altamont Landfill Open Space committee on [a] recommended list of priority areas for future acquisition and [its work with] eastern Alameda County, I'd like to request that the City consider working with other local agencies [and] the Save the Hill Group to secure funding from the Altamont Landfill Open Space Committee and partnering with [a] local park district or districts to preserve this area as open space."

Another Save the Hill representative, Michaela Morrow, then pointed to the RFEIR's report that roughly 32 acres of sensitive habitat would be permanently destroyed and asked the city council, instead, to protect the land as open space in accordance with the general plan. Save the Hill representative Bianca Covarelli, in turn, told the city council that funds were

11

available for buying and preserving Garaventa Hills as open space and " 'we're working on collaborating with finding a buyer for this unique beautiful space to maintain open space.' " Covarelli also reiterated, "This is an environmentally and ecologically sensitive, very unique, hill that should be honored and left intact as pristine, maintained open space. . . . Our goal from Save the Hill Group is to maintain this unique open space . . . ."

In response to these comments, several city council members raised questions to the planning commission regarding the possibility of preserving the Project Site as open space. Councilmember Bob Woerner acknowledged the community's desire not to have the Project and asked whether the City could buy the land itself and just " ' "make this all go away . . . ." ' " In response, Assistant City Attorney Catrina Fobian advised him that zoning rules could not be changed at that point and that he should limit his " 'evaluat[ion] [to] the project that is set before you—not look at the possibility of what the City could do with the property as we're currently not under contract to purchase that property; Lafferty Communities is under contract to purchase that property. So that would be a separate course of action, apart from your determination as to what to do with this proposal before you this evening.' "

In the same vein, Mayor John Marchand asked whether anyone had made an offer to buy Garaventa Hill and whether there were funds available, specifically "the Altamont Open Space funds," to conserve the Project Site. Planning Manager Steve Stewart responded that these funds were subject to "specific requirements" and were "tied to sites with significant native . . . biological diversity and also for non-motorized uses." Mayor Marchand also asked, " 'If we did change the zoning to be permanent open space and decided that there could be no development on this property, that constitutes a

12

taking?' " City Attorney Jason Alcala responded, " 'Yes; if the Council were to take that action, you would be faced with the likelihood of a takings lawsuit.' "[3] Taking this counsel to heart, Councilmember Woerner lamented, before voting to certify the RFEIR, "There is no way under the rules that we have to work under to get to zero. . . . This is [the] best we can do. We don't have a lot of latitude . . . ."

These discussions show the city council was very much focused, at Save the Hill's prompting, on the feasibility of a no-project alternative. While the superior court discounted them for not specifically referring to the RFEIR's project alternatives evaluation, we conclude they sufficed to fairly apprise the City of its position. (See *Castaic Lake, supra,* 180 Cal.App.4th at p. 251; *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1750 ["SORE's objections to the Project, while not identifying the precise legal inadequacy upon which the trial court's ruling ultimately rested, fairly apprised [the agency] that SORE believed the environmental impacts of developing the Project . . . would be deleterious to the surrounding community"].)

Moreover, "the doctrine of exhaustion of administrative remedies has not hardened into inflexible dogma. [Citation.] It contains its own exceptions, as when the subject matter of the controversy lies outside the administrative agency's jurisdiction [citation], when pursuit of an administrative remedy would result in irreparable harm [citations], when the administrative agency cannot grant an adequate remedy [citations], and when the aggrieved party can positively state what the administrative

---

[3] As discussed *post* (pp. 19–21), the representations by the City's attorneys that it would be illegal for the City to attempt to rezone and purchase the Project Site for conservation were not included, much less explained, in the RFEIR.

13

agency's decision in his particular case would be. ([Citation.] See also *Exhaustion of Administrative Remedies in California*, 56 Cal.L.Rev. 1061, 1068–1081.)" (*Ogo Associates v. City of Torrance* (1974) 37 Cal.App.3d 830, 834.)

The last mentioned exception applies here. The record is replete with incidences of Save the Hill representatives urging councilmembers to consider the possibility of obtaining funding to purchase and conserve the Project Site. While Save the Hill did not frame its urging in the language of the RFEIR's no-project alternative, the evidence is overwhelming that, had it done so, the result would have been the same: The City would have rejected the group's proposal and certified the RFEIR. As described, when councilmembers broached the possibility of obtaining such funding to purchase and conserve Garaventa Hills, they were advised by staff and attorneys that it was too late and would expose the City to liability under the takings clause. They were also instructed to limit their focus to the Project in front of them—even though CEQA required them to focus on both the Project and feasible alternatives, *including the no-project alternative.*

On this record, we may conclude the City had no intention to consider the alternative of not having the Project go forward. (See *Ogo Associates v. City of Torrance, supra*, 37 Cal.App.3d at p. 834.) Accordingly, we decline to apply the exhaustion of remedies doctrine as a bar to Save the Hill's no-project challenge.

## III. *The no-project alternative analysis is inadequate.*

We thus turn to the merits of Save the Hill's claim that the RFEIR's no-project alternative discussion was inadequate, as it failed to disclose and analyze information regarding the availability of funding sources that could

14

have been used to purchase and permanently conserve the Project Site.  The following standards apply.

"CEQA requires that the no project alternative discussed in an EIR address 'existing conditions' as well as 'what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services.'  (Guidelines, former § 15126, subd. (d)(4), now § 15126.6, subd. (e)(2).)  The existing conditions, supplemented by a reasonable forecast, are characterized as the no project alternative.  The description must be straightforward and intelligible, assisting the decision maker and the public in ascertaining the environmental consequences of doing nothing."  (*Planning & Conservation League, supra*, 83 Cal.App.4th at p. 911; see *Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 253.)  Moreover, the discussion "must contain sufficient detail to help ensure the integrity of the process of decisionmaking by precluding stubborn problems or serious criticism from being swept under the rug.  (*Concerned Citizens of Costa Mesa, Inc. v. 32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 [citations]; [citation].)  It must reflect the analytic route the agency traveled from evidence to action.  [Citation.]  An EIR which does not produce adequate information regarding alternatives cannot achieve the dual purpose served by the EIR, which is to enable the reviewing agency to make an informed decision and to make the decisionmaker's reasoning accessible to the public, thereby protecting informed self-government.  [Citation.]"  (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 733; see *South of Market Community Action, supra*, 33 Cal.App.5th at p. 331 [" 'overriding issue' " is whether the agency " ' "reasonably and in good faith" ' " discussed the project in sufficient detail to

15

allow the public to discern from the EIR the agency's analytic route from evidence to action].)

Thus, to prove prejudicial error, the appellant must demonstrate " 'the failure to include relevant information preclude[d] informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' [Citation.]" (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.)

Here, the RFEIR identifies "No Project, No Development" as an alternative that is environmentally superior to the Project itself because it assumes the proposed Project is not approved and the site would remain in an undeveloped state, with no development of roadways or residences. Yet the RFEIR ultimately rejects the no-project alternative because: (1) it would not meet the Project's objectives of completing implementation of the Maralisa Planned Development,[4] contributing to housing availability and providing housing near employment centers; and (2) it is "not necessarily feasible to assume the site would remain undeveloped in the long term" because the Project Site is zoned for residential development and there is no current proposal for the City or other agency to purchase or otherwise preserve it.

As Save the Hill notes, there is no mention in this discussion about the existence and feasibility of using available funding sources to purchase the Project Site and set aside Garaventa Hills for conservation rather than development. Yet respondents concede the Project Site is eligible for

---

[4] In the 1990's, development of Garaventa Hills was proposed as part of the Marlisa Planned Development, a project to construct hundreds of residences and a school north and south of Altamont Creek. However, Garaventa Hills was later removed from the Maralisa Planned Development due to environmental and hydrological concerns.

conservation funding under two settlement agreements to which the City is a party:  the Dougherty Valley Settlement Agreement (DVSA) and the Altamont Landfill Settlement Agreement (ALSA).  The DVSA, deployed to mitigate environmental impacts from a large housing project, required the developer to pay several million dollars in fees into a settlement fund to be used by the City for acquisitions, including permanent trails, open space, or agricultural preservation easements, in two areas: (1) north of Interstate 580 and east of Collier Canyon Road in Alameda County (which includes the Project Site); and (2) the Tassajara Valley area of Contra Costa County.

The DVSA also mandates with respect to open space acquisitions that priority be given to "purchases in areas containing unique vegetation and/or endangered species habitat."  Respondents do not dispute Garaventa Hills falls within both the geographic scope of the DVSA, as it sits squarely within the area north of Interstate 580 and east of Collier Canyon Road in Alameda County, and within the environmental scope of the DVSA, as the site contains both unique vegetation and endangered species habitat.  The City itself describes the Project Site as "the last undeveloped area within the City limits in the vicinity," with "no additional development" assumed in its immediate vicinity.

The ALSA, in turn, was executed to address environmental harm from the expansion of the Altamont Landfill.  The record reflects that as of March 2018, ALSA's open space fund contained approximately $11.2 million earmarked for land acquisitions in designated areas that include the Project Site.  To that end, the Altamont Landfill Open Space Committee (Open Space Committee) adopted and the city council approved a list of priority areas for future acquisitions with ALSA funds that include the Springtown Alkali Sink

17

area, which arguably covers Garaventa Hills, upstream and hydrologically connected to the Sink.

And similar to the DVSA, the ALSA specifies that "first priority" should be given to "acquisition of property having significant value for preservation of native biological diversity and/or wildlife habitat" and that "second priority" should be given to "acquisition of property having significant value for visual character and/or non-motorized recreation." Respondents do not dispute Garaventa Hills meets both of these standards. However, they argue that conservation of Garaventa Hills would not be a reasonably foreseeable consequence of implementing the no-project alternative because the Project Site is already zoned for residential development and there is no known willing buyer.

We find weaknesses with these arguments. First, as the superior court noted when finding the RFEIR's no-project alternative evaluation deficient, the Project Site's zoning designation is not unalterable. Even our Supreme Court has recognized "the use of zoning to facilitate the availability of private recreational facilities to the residents of [a city] is within the scope of the city's police power." (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 881–882.) In fact, the record reflects that, before approving the Project at hand, the City recognized its power to change the zoning designation of a 65-plus-acre parcel of environmentally sensitive property in the vicinity of Garaventa Hills that was privately owned by the Anne and Jason Farber Foundation (Farber Property). Similar to the Project Site, the Farber Property was home to several special-status wildlife species, including vernal pool fairy shrimp, California tiger salamander, California red-legged frog and San Joaquin kit fox, that would have been impacted by development. In

18

2011, using DVSA/ALSA funds, the City purchased the Farber Property in order to permanently preserve it as open space.

In deciding to acquire the Farber Property, the City applied criteria developed by the Open Space Committee that prioritized preservation of native biological diversity and/or wildlife habitat (primary) and significant value for visual character and/or nonmotorized recreation (secondary). The Open Space Committee's criteria also included the proposed acquisition's strategic value in land protection and the existence of additional funding sources and willing sellers. As to the Farber property's strategic value, the City's staff concluded in recommending acquisition: "The Zoning Designation is Planned Development. Over the last decade and a half, the property has been under options with home-builders. The most recent development proposal for the property is for 145 residential units clustered to avoid the vernal pools and seasonal wetlands. *The District's acquisition would end development speculation on the property and preserve the property in perpetuity.*" (Italics added.)

We agree with Save the Hill that the City's acquisition of the Farber Property is noteworthy here, as it illuminates the lack of relevant information in the RFEIR's no-project alternative evaluation regarding the feasibility of acquiring Garaventa Hills to conserve it as open space. Respondents' arguments—that there is no evidence Garaventa Hills had a willing seller (like the Farber family) or had been targeted for acquisition with DVSA or ALSA funds—further illuminate this informational void. In this case, the City could not apply the criteria that it applied when acquiring the Farber Property because the relevant information was not in the RFEIR.

The RFEIR's deficiencies on this issue were laid bare at the April 22, 2019 city council meeting when several councilmembers asked for the very

information about the feasibility of acquiring the Project Site for open space (including funding sources) that Save the Hill complains was omitted. (See *ante*, pp. 11–14.) Councilmembers should have been directed to specific information in the RFEIR, but there was none. Instead, they received unsupported answers and warnings from the City's attorneys that any attempt to acquire the Project Site could expose the City to liability under the takings clause. (See *ante*, pp. 11–14.)

This begs the question: If it is illegal or otherwise impossible for the City to acquire and conserve the Project Site, why does the RFEIR's no-project alternative analysis fail to say so?[5] As the California Supreme Court warns, " '[f]ailure to disclose information called for by CEQA may be prejudicial "regardless of whether a different outcome would have resulted if the public agency had complied" with the law (§ 21005, subd. (a)).' [Citation.]" (*Banning, supra*, 2 Cal.5th at p. 942; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 405 (*Laurel Heights*) ["An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project"].)

---

[5] The City's potential for liability under the takings clause is an issue beyond the scope of this appeal. We note, however, the issue is not as straightforward as respondents suggest. For one, the "general purpose of zoning and planning is to regulate the use of land to promote the public welfare, a power the courts have construed very broadly. Indeed, one of the traditional uses of the police power lies in providing citizens adequate recreational opportunities. (See, e.g., *Associated Home Builders*[*, etc., Inc. v. City of Walnut Creek* (1971)] 4 Cal.3d 633, 638 ['The elimination of open space in California is a melancholy aspect of the unprecedented population increase which has characterized our state in the last few decades. . . . [G]overnmental entities have the responsibility to provide park and recreation land to accommodate this human expansion . . . .'].)" (*Ehrlich v. City of Culver City, supra*, 12 Cal.4th at pp. 881–882.)

20

Nor does the City's potential exposure to liability excuse its duty to fulfill CEQA's informational mandate. (*Planning & Conservation League, supra*, 83 Cal.App.4th at p. 913 ["the threat of litigation cannot be allowed to derail environmental review"].) Lafferty has never had the absolute right as owner to develop Garaventa Hills. Rather, Lafferty's plan has always been contingent on obtaining certification of a legally adequate EIR. (See *Laurel Heights, supra*, 47 Cal.3d at p. 425 [refusing to "countenance any attempt to reject an alternative on the ground that the Laurel Heights site has already been purchased or that activities there have already commenced," as it "would be untenable for [defendants] to rely on the result of their own noncompliance as a basis for determining their future action"].) As the Guidelines make clear, an EIR "shall focus on alternatives to the project or its location which are capable of avoiding or substantially lessening any significant effects of the project, *even if these alternatives would impede to some degree the attainment of the project objectives, or would be more costly*." (Guidelines, § 15126.6, subd. (b), italics added.)

Finally, we acknowledge many unknown variables exist regarding the feasibility of acquiring Garaventa Hills. However, "[d]rafting an EIR . . . involves some degree of forecasting. While foreseeing the unforeseeable is not possible, an agency [nonetheless] must use its best efforts to find out and disclose all that it reasonably can." (Guidelines, § 15144.) The fact that two funding sources exist for the precise purpose of enabling the City to acquire environmentally sensitive areas such as Garaventa Hills for conservation is just the sort of information CEQA intended to provide those charged with making important, often irreversible, environmental choices on the public's behalf.

21

At the end of the day, "CEQA compels process. It is a meticulous process designed to ensure that the environment is protected. Because the EIR is the heart and soul of CEQA, we must assure that [the] EIR facilitated the environmental review process as envisioned by CEQA." (*Planning & Conservation League, supra*, 83 Cal.App.4th at p. 911.) Here, this process failed. Lacking adequate information regarding the no-project alternative, the city council could not make an informed, reasoned decision on whether this Project should go forward. Accordingly, its decisions to certify the RFEIR and approve the Project must be set aside and a new EIR prepared. (See *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236; *Banning, supra*, 2 Cal.5th at p. 942 [EIR's omission of relevant information that resulted in inadequate evaluation of project alternatives constituted prejudicial error]; see also *Kings County, supra*, 221 Cal.App.3d at p. 735 [EIR's omission of data comparing natural gas to coal violated CEQA's informational mandate and constituted prejudicial error]; *King and Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 869 (*King and Gardiner*) [EIR's omission of sufficient information regarding mitigation for significant water supply impacts "constitutes a prejudicial violation of CEQA by itself"].)

## IV. *The RFEIR's analysis and mitigation with respect to vernal pool fairy shrimp and the Springtown Alkali Sink are adequate.*

A few issues remain. In its opening brief, Save the Hill argued the City violated CEQA by failing to analyze the Project's hydrological impacts to the downstream Springtown Alkali Sink and by failing to mitigate the loss of critical habitat for the threatened vernal pool fairy shrimp (VPFS). After respondents challenged these arguments in its brief, Save the Hill omitted them from the reply brief, thereby abandoning them. (*The Police Retirement*

*System of St. Louis v. Page* (2018) 22 Cal.App.5th 336, 346, fn. 3.) We nonetheless very briefly discuss them here.[6]

"Under CEQA, 'If the agency decides to approve a project despite its significant adverse impacts, the agency must issue findings which specifically state how the agency has responded to the significant impacts identified in the EIR.' ([Citation]; see CEQA, § 21081; CEQA Guidelines, § 15091.) One such finding is that '[c]hanges or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment.' (CEQA, § 21081, subd. (a)(1); CEQA Guidelines, § 15091, subd. (a)(1).) Any such finding must be supported by substantial evidence in the record. (CEQA Guidelines, § 15091, subd. (b).)" (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 625 (*California Native Plant*).) "[W]here substantial evidence supports the approving agency's conclusion that mitigation measures will be effective, courts will uphold such measures against attacks based on their alleged inadequacy. (*Laurel Heights, supra*, 47 Cal.3d at p. 407.)" (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1027 (*Sacramento Old City*).)

---

[6] Save the Hill also abandoned a third argument—that the RFEIR failed to address impacts from the Project's proposed construction of a pedestrian bridge—after respondents pointed out two factual flaws. First, Save the Hill mistakenly claimed the FEIR failed to address the need to realign Altamont Creek to accommodate the bridge when in fact no realignment was needed. Second, Save the Hill claimed a mitigation measure included in the DEIR, Traf-3, was erroneously omitted from the FEIR. In fact this measure was appropriately omitted because it related to vehicle traffic while the bridge proposed in the FEIR was limited to pedestrian traffic.

## A.     VPFS.

Garaventa Hills is designated as a special habitat for VPFS.  The RFEIR identifies as a potentially significant impact of the Project the permanent loss of approximately 0.004 acre of seasonal wetland that could be occupied by VPFS.  As mitigation, the RFEIR requires Lafferty to (1) complete surveys of the area using a protocol acceptable to the USFWS to determine whether VPFS are present and, if their presence is detected, (2) obtain authorization from the USFWS for the taking of VPFS before filling or disturbing the seasonal wetland and (3) provide compensatory habitat for lost habitat at a mitigation ratio of 9:1, 10:1 or 11:1 depending on the location of the mitigation site, as recommended in the East Alameda County Conservation Strategy.

Save the Hill condemns these mitigation measures as inadequate because they are conditional, requiring implementation only if VPFS are actually found on the Project Site.  However, as respondents note, the City assumed for purposes of the RFEIR that VPFS are present, even though they had not been detected, when adopting these measures.  Moreover, CEQA permits an agency to defer to a future date the adoption of more specific mitigation measures:  "[F]or kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval.  Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated." (*Sacramento Old City, supra*, 229 Cal.App.3d at pp. 1028–

24

1029; see *California Native Plant, supra*, 172 Cal.App.4th at p. 621 ["the details of exactly how mitigation will be achieved under the identified measures can be deferred pending completion of a future study"].) The RFEIR meets this standard by adopting specific performance criteria for Lafferty to follow in case VPFS are found at the Project Site.

Thus, because substantial evidence supports the City's finding that the VPFS mitigation measures are adequate, we affirm it. (*Sacramento Old City, supra*, 229 Cal.App.3d at p. 1027; *California Native Plant, supra*, 172 Cal.App.4th at p. 625.)

## B. Springtown Alkali Sink.

Save the Hill also contends the RFEIR failed to analyze foreseeable significant hydrological impacts to the Springtown Alkali Sink, an environmentally sensitive land form downstream from the Project Site. (See Guidelines, § 15125, subd. (c) ["EIR must demonstrate that the significant environmental impacts of the proposed project were adequately investigated and discussed"].) Save the Hill relies on the EIR for the Maralisa Planned Development, which acknowledged: "Water quality degradation from project development area has the potential to adversely affect the nearby downstream Springtown alkali sink area, and to contribute to water quality problems of Alameda Creek and ultimately San Francisco Bay." Based on this acknowledgment, Save the Hill claims it was arbitrary and capricious for the City to omit discussion of these impacts in the RFEIR.

Respondents have a twofold response. First, they note Save the Hill does not dispute the RFEIR's finding, based on an expert's hydrological study, that the Project will not cause significant hydrological impacts to the Garaventa Wetlands Preserve, an area adjacent to the Project Site. A fortiori, respondents continue, there must be no significant impacts to the

25

more distant Springtown Alkali Sink. Second, respondents insist the Maralisa Planned Development's EIR is irrelevant here because that project was significantly larger, involving 230 acres and several hundred residential units. This Project involves only 31.7 acres and 44 residential units.

We agree with these points, which Save the Hill does not dispute. Accordingly, because the hydrological expert's report constitutes substantial evidence supporting the City's finding of no significant hydrological impacts as a result of the Project, we uphold the RFEIR on this issue. (See *The Police Retirement System of St. Louis v. Page, supra*, 22 Cal.App.5th at p. 346, fn. 3; *Laurel Heights, supra*, 47 Cal.3d at p. 407.)

## V. *The identified compensatory mitigation measure for permanent loss of sensitive habitat is adequate.*

The RFEIR recognizes the permanent loss of up to 31.78 acres of habitat that supports the California tiger salamander, California red-legged frog, San Joaquin kit fox, California burrowing owl, and potentially the American badger. The RFEIR therefore requires Lafferty to provide offsite compensatory mitigation at a 2.5:1 to 3:1 ratio for this permanent habitat loss for each of these species, which can be on the same site if the site has sufficient space. Lafferty proposed the Bluebell site for this compensatory mitigation, an 85-acre parcel in the Springtown Alkali Sink area that contains part of Altamont Creek, sensitive soil, vernal pools, and numerous plant and animal species.

Save the Hill contends the Bluebell site is inadequate for mitigation because it is already protected open space under local law and, thus, cannot make up for the lost habitat. The local law to which the group refers is the City's general plan, goal objective OSC-1.1, policy P6: "The City shall preserve and maintain . . . the Springtown Alkali Sink area as [an] important

26

wildlife and plant habitat[] through preservation of open space in and around these areas."

Respondents counter the general plan provision is merely aspirational. It does not accomplish what the RFEIR's measure does—creation of a perpetual legal restraint on development at the Bluebell site supported by funding for both upkeep and enforcement. Respondents further note the City retains the right to compel Lafferty to protect a different mitigation site if the Bluebell site proves inadequate.

We agree with respondents. Undisputedly, the Bluebell site is suitable for mitigation, as it contains sensitive habitat that houses a variety of plant and animal species. Moreover, the RFEIR requires this site, which is currently privately owned, to be placed "under [a] permanent easement with an endowment for restoration and management in perpetuity." The general plan requires nothing of the sort. And, if the Bluebell site proves inadequate for the mitigation task with respect to any of the identified animal species, the RFEIR authorizes the City to compel Lafferty to find and protect an alternative site. (See *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 279 ["Generally, an agency does not need to identify the exact location of offsite mitigation property for an EIR to comply with CEQA"]; Guidelines, § 15126.4, subd. (a)(1)(B) ["specific details of a mitigation measure . . . may be developed after project approval when it is impractical or infeasible to include those details during the project's environmental review provided that the agency (1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard"].)

27

Finally, we turn to Save the Hill's argument that the Bluebell site's protection under a conservation easement would not result in the provision of any new resources to offset or compensate for the habitat permanently lost to the Project. "It would simply ensure the Bluebell Site would not also be lost." Save the Hill relies on *King and Gardiner, supra*, which rejected an EIR's plan to mitigate the loss of agricultural land to oil and gas activity by implementing agricultural conservation easements. The appellate court concluded "implementation of agricultural conservation easements for the 289 acres of agricultural land estimated to be converted each year would not change the net effect . . . [that] there would be 289 fewer acres of agricultural land in Kern County." (45 Cal.App.5th at pp. 875–876.)

We do not find *King and Gardiner, supra*, helpful in this case. First, it involved the proposed loss of 7,450 acres of land to an oil and gas drilling project (45 Cal.App.4th at pp. 871, 875–876), as compared to the proposed loss in this case of about 32 acres. More importantly, CEQA does not require mitigation measures that completely eliminate the environmental impacts of a project. Rather, CEQA permits mitigation measures that would substantially lessen the significant environmental effects of the project. (§ 21002.) The Guidelines, in turn, provide that mitigation may include "[c]ompensating for the impact by replacing *or providing substitute resources or environments . . . .*" (Guidelines, § 15370, subd. (e), italics added.) Consistent with this guideline, as *King and Gardiner* appears to recognize (45 Cal.App.5th at p. 875), conservation easements are an accepted part of " 'agencies' toolboxes as available mitigation' " for environmental impacts. (See *Masonite Corp. v. County of Mendocino* (2013) 218 Cal.App.4th 230, 238–239 ["[agricultural conservation easements] may appropriately mitigate the direct loss of farmland when a project converts agricultural land to a

28

nonagricultural use, even though an ACE [agricultural conservation easement] does not replace the onsite resources"]; see *Friends of Kings River v. County of Fresno* (2014) 232 Cal.App.4th 105, 124–126 [discussing case law recognizing that offsite preservation of habitats for endangered species, which is functionally similar to an agricultural conservation easement, is an accepted means of mitigating impacts on biological resources].)

Thus, for the reasons stated, we conclude substantial evidence supports the City's conclusion that preservation of the Bluebell site is adequate compensatory mitigation for the permanent loss of 31.78 acres of habitat under the Project. (See *Sierra Club, supra*, 6 Cal.5th at p. 512.)

## VI. *Save the Hill lacks standing to challenge the City's compliance with the terms of the DVSA or ALSA.*

Last, Save the Hill contends the City violated CEQA by failing to pursue the possibility of preserving Garaventa Hills in order to meet its obligations under the DVSA and ALSA to acquire environmentally important properties as compensatory mitigation to offset the environmental harms of other City projects. Save the Hill failed to raise this issue at any point prior to this appeal, thereby forfeiting review of it. (*Sea & Sage Audubon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417.) Moreover, it in any event lacks merit. Save the Hill was not a party to the DVSA or ALSA and therefore lacks standing to enforce any obligation arising from those agreements against the City. (*Republic Indemnity Co. v. Schofield* (1996) 47 Cal.App.4th 220, 227.)

### DISPOSITION

The judgment is reversed. The matter is remanded to the superior court with instructions to: (1) vacate its order denying Save the Hill's challenge by way of petition for writ of mandate to the RFEIR's no-project alternative analysis; (2) enter a modified order and a modified judgment

29

consistent with our opinion that Save the Hill's challenge to the no-project alternative analysis was both preserved and meritorious; and (3) issue a peremptory writ of mandate directing the City to set aside the certification of the RFEIR and approval of the Project. Save the Hill is entitled to recover costs on appeal.

_____

Jackson, P. J.

WE CONCUR:

_____

Simons, J.

_____

Needham, J.

A161573/*Save the Hill Group v. City of Livermore*

A161573/Save the Hill Group v. City of Livermore

Trial Court:      Superior Court Alameda County

Trial Judge:      Frank Roesch

Counsel:          Greenfire Law and Jessica L. Blome, for Plaintiff and
                  Appellant.

                  Jason Rudy Alcala, City Attorney, Kelly Joanne Trujillo,
                  Assistant City Attorney; Remy Moose Manley,
                  Sabrina V. Teller and Elizabeth R. Pollock for
                  Defendant and Respondent.

                  Buchalter, Douglas C. Straus and Alicia Guerra, for Real
                  Party in Interest and Respondent.